**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**James Durward HARPER,**
**Defendant-Appellant.**

**James Durward HARPER, Petitioner,**

v.

**UNITED STATES DISTRICT COURT**
**FOR the NORTHERN DISTRICT OF**
**CALIFORNIA, Respondent,**

**United States of America, Real Party**
**in Interest.**

**Nos. 84–1010, 84–1037 and 84–7111.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 1, 1984.

Decided April 3, 1984.

As Amended April 24, 1984.

John C. Gibbons, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

Jerrold M. Ladar, San Francisco, Cal., for defendant-appellant.

Before SNEED, FLETCHER, and REINHARDT, Circuit Judges.

REINHARDT, Circuit Judge:

James Durward Harper is charged with obtaining and selling national defense information to Polish agents in violation of United States espionage statutes. In the district court, the government and Harper agreed that the death penalty provision of the espionage statutes involved is unconstitutional. The district judge nevertheless issued a pretrial order in which he held the relevant death penalty provision constitutional. Harper appeals the order, as well as a subsequent amendment to the order, and also seeks a writ of mandamus directing the district court to vacate the order. On appeal, both parties continue to assert that the death penalty provision of the espionage statutes is unconstitutional. However, the government argues that we do not have jurisdiction over the appeals and that this is not an appropriate case in which to issue a writ of mandamus. We conclude that we lack jurisdiction over the appeals because no final judgment is involved. We hold, however, that this is an appropriate case in which to exercise our mandamus jurisdiction. We further hold that the death penalty provision of the Espionage Act is unconstitutional and void. Accordingly, we direct the district court to vacate its pretrial order.

### FACTS

Harper is a defendant in a criminal case set for trial before the United States District Court for the Northern District of California a few weeks hence. He is accused of violating 18 U.S.C. § 794 (1982) by obtaining secret national defense information and knowingly and wilfully transmitting it to an officer of the Polish Intelligence Service with intent and reason to believe that the information would be used

to the injury of the United States and to the advantage of the Polish People's Republic and the Union of Soviet Socialist Republics.[1] He allegedly received $250,000 from the Polish government for the information he conveyed.[2]

The Espionage Act, 18 U.S.C. §§ 791–99 (1982), provides that a person convicted of violating section 794 "shall be punished by death or by imprisonment for any term of years or for life." 18 U.S.C. § 794(a), (b), (c) (1982). However, the Act contains no guidelines to control the sentencing authority's discretion in determining whether the death penalty is to be imposed.

At Harper's arraignment, the district court asked both parties for briefs on the applicability of the death penalty provision.

Both parties took the position that section 794's death penalty provision had been rendered unconstitutional by *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and its progeny.

Subsequently, the district court issued an "Order Re Penalty Provision of 18 U.S.C. § 794," in which he determined that the death penalty provision was constitutional.[3] His purpose in issuing the order was twofold: "(1) to provide the defendant with certain knowledge of the penalties which may be imposed upon conviction; and (2) to determine whether the additional procedural safeguards afforded defendants in capital cases are warranted in the case at hand." The court first determined that capital punishment for acts of espionage is

---

**1.** Harper is charged with violating subsections (a) and (c) of 18 U.S.C. § 794. Those subsections provide as follows:

(a) Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life.

(c) If two or more persons conspire to violate this section, and one or more of such persons do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be subject to the punishment provided for the offense which is the object of such conspiracy.

**2.** Harper is also accused of unlawfully obtaining national defense information in violation of 18 U.S.C. § 793(b) (1982), unlawfully retaining national defense information in violation of 18 U.S.C. § 793(e) (1982), and filing a false income tax return in violation of 26 U.S.C. § 7206(1) (1982).

**3.** The district judge believed that he had a duty to determine the constitutionality of the death penalty provision independently because sentencing is a matter generally left to the judge and because the parties are not free to enter into agreements on sentencing that bind the court. Thus, the court concluded in effect that

the prosecutor was without authority to elect not to invoke the death penalty provision of the statute, or to put it differently, not to invoke the court's death penalty authority. We note that, generally, states allow the prosecutor to elect whether or not to seek the death penalty in particular cases and that this decision triggers the procedural rights that govern the trial. *See, e.g.,* Cal.Penal Code §§ 190–190.5 (West Supp. 1984); *Sand v. Superior Court,* 34 Cal.3d 567, 668 P.2d 787, 194 Cal.Rptr. 480 (1983). *See also Gregg v. Georgia,* 428 U.S. 153, 199 & n. 50, 96 S.Ct. 2909, 2937 & n. 50, 49 L.Ed.2d 859 (1976) (plurality opinion); *Jurek v. Texas,* 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976) (plurality opinion); *Proffitt v. Florida,* 428 U.S. 242, 254, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976) (plurality opinion). Because neither party has raised or briefed the question whether federal law similarly gives the prosecutor the choice whether to invoke the death penalty and any attendant special procedural provisions, we do not decide that question here. For the same reason we do not decide what procedures are available in a trial where the crime is a capital offense under the statute but imposition of the death penalty would be unconstitutional. *See United States v. Kennedy,* 618 F.2d 557, 558 (9th Cir.1980) (per curiam) ("If the [procedural protection's] purpose derived from the nature of the offense with which the defendant is charged and not from the potential severity of the punishment, it remains in effect [even if the death penalty provision is unconstitutional]."). *Compare United States v. Martinez,* 536 F.2d 886 (9th Cir.1976), *cert. denied,* 429 U.S. 907, 97 S.Ct. 273, 50 L.Ed.2d 189 (1976) (right to 20 peremptory challenges under Fed.R.Crim.P. 24(b) does not apply if death penalty provision is unconstitutional), *with United States v. Watson,* 496 F.2d 1125 (4th Cir.1973) (right to two lawyers applies regardless of constitutionality of death penalty provision).

not uniformly disproportionate to the severity of the offense and is therefore not unconstitutional *per se.* It then proceeded to determine whether the specific provision in section 794 was valid. The court recognized that the eighth amendment requires that a sentencing authority's discretion to impose the death penalty must be " 'suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action,' " (quoting *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (plurality opinion)), and it acknowledged that "the sentencing discretion afforded it by section 794 necessitates the formulation of sentencing guidelines which will ensure the reliable imposition of punishment." The court, however, found section 794 constitutional by reading the section as delegating to district courts faced with death penalty trials the duty to formulate and apply the necessary guidelines:

> [I]f the penalty stage of this proceeding is reached, the court will apply sentencing guidelines designed to comply with both the legislative mandate requiring that the death penalty be considered when sentencing a defendant upon conviction for espionage, and the eighth amendment requirement that the sentencing authority be suitably guided in determining whether the death penalty, or a lesser penalty, is the appropriate punishment in a given case. The court believes that the articulation of such guidelines, if necessary, will render the penalty provision of section 794 constitutional as applied in its present form.

Accordingly, in its order the court notified Harper that he was charged with capital crimes punishable by death and that he was entitled to the statutory safeguards applicable in capital cases. The court subsequently issued an amendment clarifying its order.[4]

Harper originally filed a notice of appeal from the district court's order. He subsequently filed a petition for writ of mandamus and a motion to consolidate his petition with his previously-noticed appeal. He has also filed an appeal from the district court's order amending its previous order. We hereby consolidate the two appeals and the petition for writ of mandamus.

## DISCUSSION

### I. INTERLOCUTORY APPEAL UNDER 28 U.S.C. § 1291

■ Harper first asserts that this court has jurisdiction over his appeals under 28 U.S.C. § 1291 (1982), which gives the Court of Appeals jurisdiction to review "all final decisions of the district courts," both civil and criminal. The Supreme Court has recognized that section 1291 authorizes review of some types of interlocutory orders. *See Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949) ("collateral order" exception to the final judgment rule). Harper argues that his appeals fall within the exception to the final-judgment rule articulated in *Abney v. United States,* 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977).

*Abney* involved an appeal from a pretrial order denying a motion to dismiss an indictment on double jeopardy grounds. The Court in *Abney* noted the "firm congressional policy against interlocutory or 'piecemeal' appeals," *id.* at 656, 97 S.Ct. at 2038, and pointed out that "[a]dherence to this rule of finality has been particularly strin-

---

**4.** Among the safeguards the district court believed petitioner was entitled to was the right to a second attorney. The district court's original order appeared to require petitioner to name a second attorney. Harper complains of that requirement, arguing that it is burdensome to him financially, would cause delay, and interferes with his sixth amendment right to choose his own counsel. We need not consider these arguments, for the amendment to the order makes it clear that the district court was *allowing* Harper, not requiring him, to name a second attorney. Harper argues that the district court's amendment of the order is invalid because it was issued after he had appealed the order and thus after the district court had lost jurisdiction over the case. We need not decide whether the district court had jurisdiction to amend the order when it did. Because we believe the original order was at most ambiguous, we treat the amendment as simply an explanation or clarification of the order's original meaning. That meaning is in any event clearly the one that the statute would require us to give an ambiguous order.

gent in criminal prosecutions." *Id.* at 657, 97 S.Ct. at 2039. The Court found, however, that the order at issue was within the " 'small class of cases' . . . beyond the confines of the final-judgment rule." *Id.* at 659, 97 S.Ct. at 2040.

In arriving at its holding, the Court discussed three aspects of the type of order at issue. First, it noted that the order "constitute[s] a complete, formal, and, in the trial court, final rejection of" the claim the order addresses. *Id.* at 659, 97 S.Ct. at 2040. Second, it said that "the very nature of [the claim] is such that it is collateral to, and separable from the principal issue at the accused's impending criminal trial, *i.e.*, whether or not the accused is guilty of the offense charged." *Id.* Finally, the order involved "rights . . . [that] would be significantly undermined if appellate review . . . were postponed until after conviction and sentence." *Id.* at 660, 97 S.Ct. at 2040. In subsequent cases, the Court has made it clear that a pretrial order is not appealable if it does not share all three of those characteristics. *See United States v. MacDonald*, 435 U.S. 850, 98 S.Ct. 1547, 56 L.Ed.2d 18 (1978); *United States v. Hollywood Motor Car Co., Inc.*, 458 U.S. 263, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982); *Flanagan v. United States*, — U.S. —, —, 104 S.Ct. 1051, 1055, 79 L.Ed.2d 288 (1984).

The instant order clearly satisfies the first two requirements. It constitutes a "complete, formal, and, in the trial court, final rejection of" the defendant's claim that this is not a death penalty case because section 794's death penalty provision is unconstitutional. And the "very nature of" the claim that the death penalty provision is unconstitutional "is such that it is

collateral to, and separable from the principal issue at [Harper's] impending trial," i.e., whether or not Harper is guilty of espionage.

It is the third requirement, however, that precludes an interlocutory appeal here. In *Abney*, the Court said that the rights involved in that case would be significantly undermined if review were postponed until final judgment because the double jeopardy clause protects individuals from "being twice put to *trial* for the same offense." 431 U.S. at 661, 97 S.Ct. at 2041 (emphasis in original). "Consequently," the Court stated, "if a criminal defendant is to avoid *exposure* to double jeopardy and thereby enjoy the full protection of the Clause, his double jeopardy challenge to the indictment must be reviewable before that subsequent exposure occurs." 431 U.S. at 662, 97 S.Ct. at 2041 (emphasis in original). Similarly, the right guaranteed by the Speech or Debate Clause, which the Court has held may also be vindicated through an interlocutory appeal, *see Helstoski v. Meanor*, 442 U.S. 500, 99 S.Ct. 2445, 61 L.Ed.2d 30 (1979), is a right not to be tried at all. The Court has said that the Double Jeopardy and Speech or Debate rights "are *sui generis* in this regard." *See Flanagan*, — U.S. at —, 104 S.Ct. at 1055.[5]

The only other criminal case in which the Court has thus far recognized a right to an interlocutory appeal involved the right to be released on bail pending appeal. *See Stack v. Boyle*, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 1 (1951). The "crucial characteristic" of an order denying bail, the Court has observed, is that any challenge to it would become moot if review awaited conviction and sentence. *See Flanagan*, — U.S. at —, 104 S.Ct. at 1055. In its most recent discussion of the availability of an interloc-

5. Courts of Appeals, however, have found at least one other type of claim to fall squarely within the *Abney-Helstoski* rule. A special panel of this court recently relied on the reasoning of *Abney* and *Helstoski* in holding that a federal judge who had been indicted on federal charges was entitled to an interlocutory appeal of the denial of the claim that the United States Constitution, and particularly the separation of powers principle, immunizes sitting federal judges from criminal prosecution. *United States v.*

*Claiborne*, 727 F.2d 842 (9th Cir. 1984). *See also United States v. Hastings*, 681 F.2d 706 (11th Cir.) (same as *Claiborne*), *stay denied*, 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942, *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983); *United States v. Myers*, 635 F.2d 932, 935–36 (2d Cir.) (Congressman's separation-of-powers based claim of immunity from criminal prosecution immediately appealable), *cert. denied*, 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

utory appeal in a criminal case, the Supreme Court noted that all three of the foregoing cases involved a right that "would be irretrievably lost if review were postponed until trial is completed." *Id.*

Harper does not argue that the rights he asserts are rights that, like those asserted by Abney, Helstoski, and Stack, would be irretrievably lost if review were postponed until after trial. He maintains that section 794's death penalty provision is unconstitutional under the eighth amendment. The eighth amendment protects individuals from the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. Harper does not argue that the amendment protects him from having to endure a trial for a crime carrying a penalty that may be cruel and unusual. Rather, he asserts that the erroneous order will cause him to undergo much hardship that cannot be corrected on appeal. The Supreme Court precedents require us to focus on the nature of the right asserted by the defendant, not the hardships caused by the order. Thus, we believe that this case falls outside the narrow class of criminal cases in which interlocutory appeals are available.

## II. MANDAMUS

The All Writs Statute, 28 U.S.C. § 1651 (1982), provides that the courts of appeals may issue "all writs necessary or appropriate in aid of their ... jurisdiction[ ] and agreeable to the usages and principles of law." That statute unquestionably gives us the power to issue the writ petitioner seeks. "The question of naked power [under the All Writs Act] has long been settled by [the Supreme Court]." *LaBuy v. Howes Leather Co.,* 352 U.S. 249, 255, 77 S.Ct. 309, 313, 1 L.Ed.2d 290 (1957). If the court of appeals would have the power to entertain appeals in a case at some stage of the proceedings, it has the power to issue writs of mandamus in the case. *See id.* Because we clearly would have jurisdiction over an appeal from a final order in this case, we plainly possess the power to issue a writ of mandamus here.

■ The question we face is therefore whether this is a proper case in which to issue a writ of mandamus to the district court. " '[T]he common-law writs, like equitable remedies, may be granted or withheld in the sound discretion of the court.' " *Id.* (quoting *Roche v. Evaporated Milk Association,* 319 U.S. 21, 25, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943)). In exercising our discretion, we should keep in mind that mandamus is an "extraordinary remedy" that should only be invoked in "exceptional circumstances." *Will v. United States,* 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967). As the Supreme Court has emphasized, "[m]andamus ... does not 'run the gauntlet of reversible errors.' " *Id.* at 104, 88 S.Ct. at 278 (quoting *Bankers Life & Casualty Co. v. Holland,* 346 U.S. 379, 382, 74 S.Ct. 145, 147, 98 L.Ed. 106 (1953)). Our discretion should also be guided by the policies behind the final judgment rule, and we should keep in mind that those policies take on particular force in criminal cases. *See id.* 389 U.S. at 96, 88 S.Ct. at 274.

■ This court has articulated "objective principles" to guide the exercise of the mandamus power. *See In re Cement Antitrust Litigation,* 688 F.2d 1297 (9th Cir. 1982), *aff'd sub nom. Arizona v. United States District Court,* 459 U.S. 1190, 103 S.Ct. 1172, 1173, 75 L.Ed.2d 425 (1983); *United States v. Greger,* 657 F.2d 1109 (9th Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 1891, 77 L.Ed.2d 281 (1983); *Bauman v. United States District Court,* 557 F.2d 650 (9th Cir.1977). The principles were designed to guard against subversion of the policies underlying the finality rule. *See Bauman,* 557 F.2d at 653. In *Bauman,* we specified five guidelines to be considered in determining whether to issue the writ:

(1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal.... (3) The district court's order is clearly erroneous as a

matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.

*Bauman,* 557 F.2d at 654–55 (citations omitted). As we have noted, these considerations "are cumulative and proper disposition will often require a balancing of conflicting indicators." *Id.* at 655. Although we have never granted the writ on the basis of only one of the guidelines, or when most of the guidelines pointed against issuing the writ, *see id.* at 656, we have emphasized that the guidelines "are not meant to supplant reasoned and independent analysis by appellate courts." *In re Cement Antitrust Litigation,* 688 F.2d at 1301. Rather, they "serve only as a useful starting point, an analytic framework for determinations regarding the propriety of mandamus relief." *Id.*

Application of the five traditional guidelines leads to the conclusion that the writ should issue here. Four of the five considerations militate in Harper's favor. So do other factors that we deem important.

Rarely, if ever, will the final two *Bauman* guidelines both be applicable in a given case: the fourth contemplates a case presenting an oft-repeated error, and the fifth a case presenting a novel question. Where one of the two is present, the absence of the other is of little or no significance. Here, the relevant guideline is the one relating to "new and important problems, or issues of law of first impression," *Bauman,* 557 F.2d at 655; the oft-repeated error standard is clearly inapplicable. Whether the death penalty provision of the Espionage Act is constitutional is certainly an important question—particularly to someone facing charges under the Act. It is also a question of first impression: the only judicial discussion of the issue is in dictum in an opinion by a district court in Florida. *United States v. Helmich,* 521 F.Supp. 1246, 1248 & n. 2 (M.D.Fla.1981) (concluding that *Furman* has "apparently" rendered section 794's death penalty provi-

sion unconstitutional), *aff'd,* 704 F.2d 547 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 353, 78 L.Ed.2d 317 (1983).

■ The third *Bauman* factor requires us to examine the merits of the district court's order. Notwithstanding the novel nature of the issues it addresses, we are convinced that the order was clearly erroneous. A question of law is "clearly erroneous" for the purposes of a mandamus petition if we are "left with the definite and firm conviction that a mistake has been committed." *In re Cement Antitrust Litigation,* 688 F.2d at 1305 (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). As our discussion in the next section will indicate, we believe it is entirely clear that the district judge erred in his interpretation of the law. In applying this guideline, we attach some weight to the fact that the parties agree on the merits of the constitutional issue.

■ We now turn to the remaining two factors, the first and second, which are closely related: whether the petitioner has another adequate means to obtain the relief he seeks, and whether petitioner will be damaged or prejudiced in a way not correctable on appeal. Both strongly favor granting the writ here. As to the first factor, we have already said in Section I that an interlocutory appeal is unavailable in this case. As to the second, while it is true that an erroneous imposition of the death penalty may be corrected on appeal from final judgment, the district court's order will have significant effects on the defendant and on defendant's trial regardless of whether the death penalty is ultimately imposed. We believe that the district court's order imposes considerable hardships that cannot be corrected on appeal from final judgment.

If we refused to decide now that the district court's order is invalid, Harper would have to endure a trial for a capital offense after having been formally advised by the district court that the outcome might be the extinguishment of his life. As the Supreme Court has recognized, the

death penalty is unique. Because of its extreme severity and irrevocability, it is "different in kind from any other punishment imposed under our system of criminal justice." *See Gregg v. Georgia*, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976) (plurality opinion). "Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two." *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion). Enduring a trial that entails the possibility of a death penalty imposes a hardship "different in kind" from enduring the discomfiture of any other trial. The emotional stress and strain of a trial in a capital case are extreme in character and *sui generis*. We consider the ordeal of undergoing such a trial truly a substantial hardship. It is certainly far more extreme a hardship than some we have previously held sufficient to meet the second *Bauman* factor. *See, e.g., Varsic v. United States District Court*, 607 F.2d 245 (9th Cir.1979) (hardship that indigent would suffer from having to prosecute civil action 3,000 miles from home).

The district court's order could also be expected to prejudice Harper in other ways that might not be correctable on appeal from final judgment. For instance, the spectre of the death penalty would be likely to influence many tactical decisions he would make during his trial. It might well lead him to take fewer chances in his defense. These death-penalty-influenced decisions could ultimately prejudice Harper even if he were not to receive the death penalty or if he were sentenced to death and the sentence were reversed on appeal. In order to obtain a new trial, however, Harper would probably have to show that particular decisions were made as the result of the erroneous order and that those decisions prejudiced him. *But cf. United States v. Greger*, 657 F.2d 1109 (9th Cir. 1981) (prejudice from erroneous order disqualifying counsel in criminal case is presumed), *cert. denied*, — U.S. —, 103 S.Ct. 1891, 77 L.Ed.2d 281 (1983). Because the prejudice would not be easily measurable or demonstrable, any injury that Harper would suffer might for all practical purposes not be correctable.

The order might also lead the petitioner to forego his constitutional right to a trial altogether. Defendants may be given more lenient sentences in exchange for a waiver of their right to trial. *See Corbitt v. New Jersey*, 439 U.S. 212, 99 S.Ct. 492, 58 L.Ed.2d 466 (1978) (although defendants may not be penalized for exercising their right to a jury trial, they may be rewarded for foregoing the right). Negotiating a plea agreement for a prison sentence would, if the court accepted the agreement, provide Harper with the only certain protection against his execution. The Supreme Court has held that a guilty plea entered in order to avoid a possible death sentence is not coerced or involuntary so as to render it invalid even if the death penalty provision involved later proves to have been unconstitutional. *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970). Harper would thus be unable to challenge his guilty plea successfully on appeal even if he demonstrated that the order had been the "but for" cause of his plea. *Id.* at 750, 90 S.Ct. at 1470. It is undeniable, however, that, by presenting Harper with the "grisly choice," *see Fay v. Noia*, 372 U.S. 391, 440, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963), between risking a death sentence and foregoing his procedural rights, the order places Harper in an unenviable position and causes him a significant hardship that may properly play a part in our decision to exercise our mandamus jurisdiction.

In addition to the traditional *Bauman* criteria, two factors set this case apart from the ordinary criminal proceeding and influence our decision to employ the drastic remedy of mandamus. We have already mentioned one—that both parties argue that the district court's decision is erroneous. When the government as well as the defendant urges that the district court has erred with respect to an important matter affecting the manner in which a criminal trial is to be conducted, there is more rea-

son to invoke our discretionary authority than in the normal case. The second factor is that this case involves sensitive matters of national security. During the course of an espionage trial the government may be compelled to disclose information that jeopardizes intelligence sources or even compromises the national security. The interest of the government—and of the public—in disposing of such cases without trial is particularly strong. We noted earlier that the spectre of a possible death penalty may influence a defendant to enter a plea in hopes of obtaining a lesser penalty. We are equally aware, however, that the district court's erroneous view of the law may ultimately make a disposition without trial more difficult. As long as the district judge believes that execution is a possible punishment for the offense involved, a defendant may be unwilling to enter a Rule 11(e)(1)(B) plea.[6] Furthermore, a judge who is laboring under such a mistaken view may refuse to approve the terms of a Rule 11(e)(1)(C) agreement[7] that he might otherwise consider reasonable and appropriate. If the case does go to trial, the government's interest in a prompt and efficient trial—and in having only one trial—would, for the same national security reasons, be even greater than in the usual case. Yet the district court's invalid order may well adversely affect that interest. Where a potential death sentence is at stake, the trial is likely to be longer and more complex, and to involve a large number of bitterly-fought legal issues. Obtaining a conviction may be more difficult when execution is a possible end result, and the prosecution may feel compelled to release even more sensitive information than it might otherwise have to disclose. In short, the relevant considerations, including those relating to the "efficient and orderly administration of the district courts," *In Re Cement Antitrust Litigation,* 688 F.2d at 1301, militate strongly in favor of issuing a writ of mandate.

## III. THE CONSTITUTIONALITY OF SECTION 794's DEATH PENALTY PROVISION

The district court recognized that, after *Furman* and its progeny, a sentencing authority's discretion to impose the death penalty "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia,* 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976). The district court believed, however, that the constitutional problems with the statute would be cured if it formulated the necessary guidelines limiting its discretion itself, and it proposed to do so when the sentencing stage was reached. In this regard, the district court clearly erred.

In *Furman,* the Supreme Court struck down a death penalty statute that left the decision whether to impose the death penalty to the unfettered discretion of the sentencing authority. In *Gregg,* the Court upheld the constitutionality of the revised Georgia death penalty statute because the discretion of the sentencing authority to impose the death penalty had by then been suitably limited and guided by the legislature. *See also Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Jurek v. Texas,* 428 U.S. 262, 96

---

**6.** Rule 11(e)(1) provides as follows:

The attorney for the government and the attorney for the defendant or the defendant when acting pro se may engage in discussions with a view toward reaching an agreement that, upon the entering of a plea of guilty or nolo contendere to a charged offense or to a lesser or related offense, the attorney for the government will do any of the following:

(A) move for dismissal of other charges; or

(B) make a recommendation, or agree not to oppose the defendant's request, for a particular sentence, with the understanding that such recommendation or request shall not be binding upon the court; or

(C) agree that a specific sentence is the appropriate disposition of the case.

The court shall not participate in any such discussions.

**7.** *See supra* note 5. *See also* Rule 11(e)(2), which affords a district judge the discretion to accept or reject any plea agreement, including one providing for a specific sentence.

S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). The question presented by this case is whether the guidelines plainly required by *Gregg* and its companion cases must be contained in the statute or may be formulated by the sentencing judge at the time of sentencing. Although this is a question of first impression, the cases cited above leave no room for the argument that the guidelines may be formulated by the judge at the time of sentencing *or at any other time.*

■ First, it would certainly be anomalous to hold that the guidelines, which are required in order to limit the discretion of a sentencing authority, may be supplied by the sentencing authority itself. Whenever the judge is the sentencing authority, the guidelines would, under the district court's theory, be no limitation at all. The requirement that the discretion be "suitably limited and directed" clearly requires an *external* limitation.

Moreover, the Court's opinions compel the conclusion that, whether the sentencing authority is the judge or the jury, the guidelines must come from Congress, not from the courts. *Gregg* is replete with references to the peculiarly legislative character of sentencing determinations, and the particularly limited role of judges in this area:

> [T]he requirements of the Eighth Amendment must be applied with an awareness of the limited role to be played by courts....
>
> ... [W]e may not act as judges as we might as legislators....
>
> ....
>
> [T]he constitutional test is intertwined with an assessment of contemporary standards and the legislative judgment weighs heavily in ascertaining such standards. "[I]n a democratic society legislatures, not courts, are constituted to respond to the will and consequently the moral values of the people." *Furman v. Georgia, supra,* [408 U.S.] at 383 [92 S.Ct. at 2749] (Burger, C.J., dissenting).... [Specification of punishments]

"[is] peculiarly [a] question[ ] of legislative policy." *Gore v. United States,* 357 U.S. 386, 393 [78 S.Ct. 1280, 1285, 2 L.Ed.2d 1405] (1958).

*Gregg,* 428 U.S. at 174–76, 96 S.Ct. at 2925–27 (plurality opinion).

The district judge in this case himself quoted some of the foregoing language for the proposition that Congress's determination that the death penalty is appropriate for some acts of espionage must be given great deference; and, indeed, the *Gregg* Court employed the language in a similar context. The principles enunciated, however, are just as germane to the question of *where* the required guidelines must come from. If the "will and ... moral values of the people," *id.* at 175, 96 S.Ct. at 2926, are particularly important in sentencing decisions, and if specification of punishments is therefore peculiarly a legislative function, then specifying the circumstances under which someone may be put to death must also be a function of the elected representatives of the people. It is for that reason that, in finding Georgia's revised procedures constitutional, the Court emphasized that the guidelines were statutory: "[Under the revised Georgia procedures, the jury] must find a *statutory* aggravating circumstance before recommending a sentence of death." *Gregg,* 428 U.S. at 197, 96 S.Ct. at 2936 (emphasis in original). The Court has thus plainly required that guidelines be expressly articulated *by the legislature* in the statute authorizing the death penalty. *See also id.* at 192, 96 S.Ct. at 2934 ("It seems clear ... that the problem [of unfettered jury discretion to impose the death penalty] will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant that the *State, representing organized society,* deems particularly relevant to the sentencing decision." (emphasis added)).

■ The conclusion that the Constitution requires legislative guidelines in death penalty cases is thus inescapable. That is the position not only of petitioner, but also of the government, whose brief on this issue in the district court stated that section

794's death penalty provision is "unenforceable and void because it sets forth no *legislated* guidelines to control the fact-finder's discretion ..." (emphasis added). The Department of Justice has long been of the view that *Furman* rendered section 794's death penalty provision unconstitutional. *See Imposition of Capital Punishment: Hearings on S. 1, S. 1400, and S. 1401 Before the Subcomm. on Criminal Laws and Procedures of the Comm. of the Judiciary*, 93d Cong., 1st Sess. 43 (1973) (statement of Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, Department of Justice); *To Establish Constitutional Procedures for the Imposition of Capital Punishment: Hearings on S. 1382 Before the Subcomm. on Criminal Laws and Procedures of the Comm. on the Judiciary*, 95th Cong., 1st Sess. 22 (1977) (statement of Mary Lawton, Deputy Assistant Attorney General, Office of Legal Counsel, Department of Justice); *Capital Punishment: Hearings on S. 114 Before the Comm. of the Judiciary*, 97th Cong., 1st Sess. 33 (1981) (statement of D. Lowell Jensen, Assistant Attorney General, Criminal Division, Department of Justice). Moreover, the Senate has recently passed a bill, supported by the Justice Department, that would authorize the imposition of the death penalty for certain crimes, including espionage. S. 1765, 98th Cong., 2d Sess., 130 Cong. Rec. S1491–93 (daily ed. Feb. 22, 1984).

In light of the above, we believe it clear that the death penalty provision of the espionage statutes is unconstitutional. It cannot be saved by judicial formulation of the missing, but essential, statutory guidelines.

### CONCLUSION

This court lacks jurisdiction over the interlocutory appeals of the district court's orders. Accordingly, we dismiss the appeals. We have jurisdiction, however, to grant a writ of mandamus. We conclude that this is an appropriate case in which to issue the writ: the district court's order presents a new and important question of law to which the court gave a clearly erroneous answer; the order will cause petitioner severe hardship if it is not vacated prior to trial; the order is likely to prejudice petitioner in ways not correctable on appeal; and other significant factors militate in favor of granting the extraordinary relief. On the merits, we hold that section 794's death penalty provision is unconstitutional and void. Accordingly a writ directing the district court to vacate its "Order re Penalty Provision of 18 U.S.C. § 794" should issue. IT IS SO ORDERED.

FLETCHER, Circuit Judge, concurring:

I concur fully in the majority opinion. I write separately simply to state that in addition to the reasons stated by the majority for granting the writ that I gave weight to the unnecessary problems that might attend jury selection were the order to stand. If Harper exercised his right to a jury trial, the district court's order would materially affect the nature of the voir dire and might well materially affect the composition of the jury. Prior to the commencement of the jury selection process, the district judge would be required to resolve complex and difficult constitutional questions that should await resolution until a case necessitating their resolution arises. Specifically, the court would first have to determine whether in a trial in which the judge, rather than a jury, imposes the sentence, persons who would be unwilling, as a matter of conscience, to vote to impose the death penalty could be excluded for cause. *See Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). If a prospective juror were to indicate such a conviction, the judge would then have to resolve the question whether a verdict returned by such a "death qualified" jury can withstand constitutional scrutiny and, if so, under what circumstances.[1]

---

**1.** In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the Supreme Court rejected a challenge to a verdict returned by a jury from which anyone who "'might hesitate to return a verdict inflicting [death]'" had

been excluded. 391 U.S. at 513 n. 2, 88 S.Ct. at 1772 n. 2 (emphasis deleted). It said that

[t]he data adduced by the petitioner ... are too tentative and fragmentary to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.

391 U.S. at 517–18, 88 S.Ct. at 1774–75 (footnote omitted). Since *Witherspoon* several courts have, on the basis of fuller records including numerous post-*Witherspoon* studies, concluded that at least certain types of "death-qualified" juries are more prone to convict. *See Keeten v. Garrison,* 578 F.Supp. 1164 (W.D.N.C.1984); *Grigsby v. Mabry,* 569 F.Supp. 1273 (E.D.Ark. 1983); *Hovey v. Superior Court,* 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980).