**VALLEY BROADCASTING COMPANY, Petitioner,**

v.

**UNITED STATES DISTRICT COURT FOR the DISTRICT OF NEVADA, Respondent,**

**United States of America, Anthony Spilotro, et al., Real Parties in Interest.**

**No. 86–7103.**

United States Court of Appeals, Ninth Circuit.

Submitted March 21, 1986.

Decided Sept. 2, 1986.

Janet Frasier Phillips, Las Vegas, Nev., for petitioner.

L.J. O'Neale, Dept. of Justice, Washington, D.C., for respondent.

Before GOODWIN, NORRIS and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

This case requires us to decide whether the public's common law right to copy and inspect public records and documents includes the right to copy audio and videotape exhibits as they are received in evidence during a criminal trial.

Valley Broadcasting Company (Valley Broadcasting) brought this petition for writ of mandamus after the district court denied its request to copy certain audio and video tapes as they were admitted into evidence in *United States v. Spilotro, et. al.*, CR–LV–83–11–LDG (*Spilotro*), a prominent RICO conspiracy case now underway in Nevada. That case arises from a 1983 indictment alleging that Anthony Spilotro and numerous others engaged in various racketeering enterprises associated with the so-called "Hole-in-the-Wall Gang."[1] The indictment alleges that Spilotro and others planned and conducted a series of residential burglaries and distributed the stolen proceeds through a fencing network.

On January 31, 1985, Valley Broadcasting's television station, KVBC–TV, filed an application to permit its correspondents to attend all judicial proceedings in the case and to copy all evidence, including audio and video tapes, after admission into evidence. On June 17, 1985, the district court granted the application. On January 14, 1986, after three weeks of voir dire, the jury was empaneled, and the *Spilotro* trial commenced. On February 6, 1986, several exhibits consisting of black and white photographs were admitted into evidence and displayed in open court. The district court

---

1. We take judicial notice of the widely-publicized death of Anthony Spilotro and his brother Michael that has undoubtedly heightened the public awareness of the instant proceeding. *See* Fed.R.Evid. 201. Both Anthony Spilotro and his brother were found buried in a northwest Indiana cornfield in June 1986. *See* Los Angeles Times, June 24, 1986, at 1, col. 5.

denied KVBC–TV access to the exhibits and informed its counsel that the district court's prior order granting access to all exhibits had been temporarily restrained. On February 21, the district court lifted its restrictions on access to all exhibits except for certain audio and video tapes. It is access to these items of evidence that Valley Broadcasting now seeks in its petition for writ of mandamus.[2]

In denying Valley Broadcasting's request for access to the tapes, the district court relied upon the Fifth Circuit's opinion in *Belo Broadcasting Corp. v. Clark,* 654 F.2d 423, 434 (5th Cir.1981). The district court held that Valley Broadcasting's common law right of physical access to the tapes in evidence was outweighed by: (a) the administrative and mechanical difficulties attending inspection and copying of the tapes, including the possibility of erasure or loss of the originals; (b) the difficulty of selecting jurors in related but yet untried cases; and (c) the danger that jurors in the *Spilotro* trial itself might be exposed to press reports and that a mistrial might result.

In response to an order of this court to supplement the record, the government has submitted copies of the indictments in the cases the government contends bear some relation to the evidence sought to be copied by Valley Broadcasting. One of those cases, *United States v. Spilotro, et al.,* CR–LV–83–116–LDG (the "witness" case), is based on an indictment alleging that Anthony Spilotro along with Wayne Matecki conspired to obstruct justice and to interfere with the civil rights of Sherwin Lister, a government informant and witness, by causing or conspiring to cause his death. The other criminal action, *United States v. Spilotro, et al.,* CR–LV–81–92–HEC (the "jewelry" case), involves an indictment alleging that Spilotro along with several others operated a racketeering scheme for the distribution of jewelry stolen from Illinois and New York establishments. Among the defendants in that action is Joseph C. Blasko, a former detective with the Organized Crime Bureau of the Las Vegas Metropolitan Police Department.

The government has also provided us with the transcripts of the audio and video tapes which may be introduced in the *Spilotro* trial. These tapes generally record conversations occurring during the planning or commission of residential burglaries. The district court also has confirmed that copies of the original audio and video tapes are in existence and are in the possession of the Federal Bureau of Investigation (FBI).

## MANDAMUS

Mandamus is an "extraordinary remedy" that should be invoked only in "exceptional circumstances," *Will v. United States,* 389 U.S. 90, 95, 88 S.Ct. 269, 273, 19 L.Ed.2d 305 (1967), and we have articulated several objective criteria designed to guide us in the exercise of our power to issue such a writ. In considering whether to grant a petition for writ of mandamus we must determine whether:

(1) The party seeking the writ has no other adequate means, such as a direct appeal, to attain the relief he or she desires. (2) The petitioner will be damaged or prejudiced in a way not correctable on appeal.... (3) The district court's order is clearly erroneous as a matter of law. (4) The district court's order is an oft-repeated error, or manifests a persistent disregard of the federal rules. (5) The district court's order raises new and important problems, or issues of law of first impression.

*Bauman v. United States District Court,* 557 F.2d 650, 654–55 (9th Cir.1977).

These factors are to be considered in the aggregate and often require a careful

---

2. During our consideration of this matter, the *Spilotro* case suffered a mistrial. A new trial has now commenced. Because Valley Broadcasting continues to seek access to the tapes and because that access is still being denied by the district court, this petition is not mooted by the mistrial. *See generally Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911).

weighing before an appellate court can determine whether a writ should issue.[3] Nonetheless, the factors are not intended to "supplant reasoned and independent analysis" but rather "serve only as a useful starting point, an analytic framework for determinations regarding the propriety of mandamus relief." *In re Cement Antitrust Litigation*, 688 F.2d 1297, 1301 (9th Cir.1982), *aff'd sub nom. Arizona v. United States District Court*, 459 U.S. 1191, 103 S.Ct. 1173, 75 L.Ed.2d 425 (1983).

Valley Broadcasting cannot attain the requested relief on direct appeal because the tapes it seeks to copy will lose much of their newsworthiness during the pendency of the trial. Furthermore, because KVBC–TV seeks to obtain the tapes for contemporaneous broadcast, when presumably they will pack the greatest punch, delay will prejudice its application "in a way not correctable on appeal." *Bauman*, 557 F.2d at 654. Finally, this case raises a question of first impression in this circuit. Accordingly, we find that KVBC–TV's petition satisfies three of the five *Bauman* factors. In these circumstances, we believe that whether mandamus should issue turns on whether the district court's denial of Valley Broadcasting's application for immediate access to the tapes was "clearly erroneous as a matter of law." *Id.*

### PRECEDENT

The issue of when members of the public or the news media have the right to copy and inspect judicial records has never been fully addressed by the Supreme Court. *See Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978). The question, however, has been considered recently by several courts of appeals. *See, e.g., United States v. Beckham*, 789 F.2d 401 (6th Cir. 1986); *United States v. Guzzino (In re CBS, Inc.)*, 766 F.2d 302 (7th Cir.1985); *United States v. Edwards (In re Video-Indiana, Inc.)*, 672 F.2d 1289 (7th Cir. 1982); *United States v. Criden (In re National Broadcasting Co.)*, 648 F.2d 814 (3d Cir.1981). At the outset, it is important for us to delineate which rights are implicated by this question and which are not.

▉ The first and fourteenth amendments secure the public's constitutional right to attend criminal trials,[4] *see Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980). *See also Radio and T.V. News Association v. United States District Court*, 781 F.2d 1443, 1446–47 (9th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 2276, 90 L.Ed.2d 719 (1986), a right which is essential to publicizing the workings of criminal justice. *United States v. Mouzin*, 559 F.Supp. 463, 466 (C.D.Cal.1983). Because courtroom space is inherently limited, and because the public is dispersed, the media plays an indispensable representative role in gathering and disseminating to the public current information on trials. *Richmond Newspapers*, 448 U.S. at 573, 581–82 n. 18, 100 S.Ct. at 2829–30 n. 18; *Beckham*, 789 F.2d at 406. In this case, however, KVBC–TV was granted access to the proceedings themselves and was provided with transcripts of the exhibits admitted into evidence. Any first amendment rights to which existing case law entitled Valley Broadcasting were amply satisfied

---

**3.** While we have not issued a writ based upon a finding that only one of the criteria was satisfied or when the majority of the factors militated against issuance of the writ, satisfaction of all of the factors is not required. *See Bauman*, 557 F.2d at 655–56; *United States v. Harper*, 729 F.2d 1216, 1222 (9th Cir.1984). In fact, it is difficult to envision a case that involves both an oft-repeated error as well as an issue of law of first impression.

**4.** This right to attend criminal proceedings is not absolute and may be overcome by "an overriding [state] interest articulated in findings." *Richmond Newspapers*, 448 U.S. at 581, 100 S.Ct. at 2829 (plurality opinion). Likewise, judicial nondisclosure of sensitive information may be upheld when the interest sought to be protected by nondisclosure is compelling and when the denial of access is narrowly tailored to serve that interest. *Globe Newspaper*, 457 U.S. at 606–07, 102 S.Ct. at 2619–20.

by the district court's provision for media access to the trial itself.

■ Valley Broadcasting enjoys a common-law right to copy and inspect the judicial records in the *Spilotro* trial which is independent of the Constitution. The common-law right of access has historically developed to accomplish many of the same purposes as are advanced by the first amendment. For example, courts have recognized that exercise of the right helps the public keep a watchful eye on public institutions, *State ex rel. Colscott v. King*, 154 Ind. 621, 621–27, 57 N.E. 535 (1900), and the activities of government, *State ex rel. Youmans v. Owens*, 28 Wis.2d 672, 677, 137 N.W.2d 470 (1965). Yet the common-law right is not of constitutional dimension, is not absolute, and is not entitled to the same level of protection afforded constitutional rights. *Warner Communications*, 435 U.S. at 597–98, 98 S.Ct. at 1311–12.

The common law right of access cannot, for example, be " 'used to gratify private spite or promote public scandal' through the publication of 'the painful and sometimes disgusting details of a divorce case.' " *Warner Communications*, 435 U.S. at 598, 98 S.Ct. at 1312 (quoting *In re Caswell*, 18 R.I. 835, 836, 29 A. 259 (1893)). Further, district courts may refuse "to permit their files to serve as reservoirs of libelous statements for press consumption," *id.* (citing *Park v. Detroit Free Press Co.*, 72 Mich. 560, 568, 40 N.W. 731, 734–35 (1888)), "or as sources of business information that might harm a litigant's competitive standing." *Id.* (citing *Schmedding v. May*, 85 Mich. 1, 5–6, 48 N.W. 201, 202 (1891)).[5] It is the scope and extent of the common-law right of access alone that we must define here.

## COMMON–LAW ACCESS

■ Two circuits have adopted tests that contain built-in biases for or against disclosure. *Compare United States v. Myers (In re National Broadcasting Co.)*, 635 F.2d 945, 952 (2d Cir.1980) ("only the most

compelling circumstances should prevent contemporaneous public access to [reproducible evidentiary materials introduced in a criminal trial]") (footnote omitted) *with Belo Broadcasting Corp. v. Clark*, 654 F.2d 423, 431 (5th Cir.1981) (adopting a general balancing test that characterizes the public's right of access as typically subordinate to a defendant's competing fair trial rights). The middle-ground stance—preferred by three of the circuits that have ruled on applications to reproduce taped evidence for subsequent broadcast—requires that the trial court start with "a strong presumption" in favor of access, to be overcome only "on the basis of articulable facts known to the court, not on the basis of unsupported hypothesis or conjecture." *United States v. Edwards (In re Video-Indiana, Inc.)*, 672 F.2d 1289, 1294 (7th Cir.1982); *In re National Broadcasting Co., Inc.*, 653 F.2d 609, 613 (D.C.Cir. 1981) (courts should deny access only if "justice so requires"); *United States v. Criden (In re National Broadcasting Co.)*, 648 F.2d 814, 823 (3d Cir.1981) ("strong presumption that material introduced into evidence ... [should be accessible] for copying and broader dissemination"). Also, a well-considered district court decision by Judge Tashima applied the majority view. *Mouzin*, 559 F.Supp. at 465. For the reasons that follow, we also adopt this view.

In *Myers*, the Second Circuit articulated the "compelling circumstances" test that, as we have stated, carries with it a built-in bias favoring access in most cases. In reaching its conclusion, the Court relied extensively upon Supreme Court precedents such as *Richmond Newspapers* and *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Because the common-law right of access furthers concerns also protected by the First Amendment, the Second Circuit expanded the right to comparable proportions. The common-law right is separate and distinct from rights guaranteed by the first amendment, however, and the Supreme Court has

---

**5.** None of the defendants has argued that any    improper purposes are present in this case.

marked out different levels of protection. *See Warner Communications*, 435 U.S. at 602–03, 609, 98 S.Ct. at 1314–15, 1317 (implying that a balancing approach to access is required and that "[t]he First Amendment generally grants the press no right to information about a trial superior to that of the general public").

On the other hand, the Fifth Circuit's position in *Belo Broadcasting* rests on a narrower reading of *Warner Communications*. In *Belo Broadcasting*, the court stated that "[i]t is better to err, if err we must, on the side of generosity in the protection of a defendant's right to a fair trial before an impartial jury." *Belo Broadcasting*, 654 F.2d at 431. We believe that *Belo Broadcasting* is inconsistent with the Supreme Court's statement that there is a presumption "however gauged" in favor of access. *Warner Communications*, 435 U.S. at 602, 98 S.Ct. at 1314.

The majority approach adopted by the Seventh Circuit in *United States v. Edwards (In re Video-Indiana, Inc.)*, 672 F.2d 1289 (7th Cir.1982), strikes a balance that accommodates both the presumption to which the common law right of access is entitled and the limitations that may properly be placed upon it. In *Edwards* the court stated:

> While we are unwilling to go so far as the Second Circuit's statement that only exceptional circumstances will justify non-access, we hold that there is a strong presumption in support of the common law right to inspect and copy judicial records. Where there is a clash between the common law right of access and a defendant's constitutional right to a fair trial, a court may deny access, but only on the basis of articulated facts known to the court, not on the basis of unsupported hypothesis or conjecture.... We stress that it is vital for a court clearly to state the basis of its ruling, so as to permit appellate review of whether rele-

vant factors were considered and given appropriate weight.

*Id.* at 1294 (footnote omitted) (citations omitted).

Such factors as promoting the public's understanding of the judicial process and of significant public events justify creating a "strong presumption" in favor of copying access.[6] Counseling against such access would be the likelihood of an improper use, "including publication of scandalous, libelous, pornographic, or trade secret materials; infringement of fair trial rights of the defendants or third persons; and residual privacy rights." *Criden*, 648 F.2d at 830 (Weis, J., concurring).[7] In short, the district court must weigh "the interests advanced by the parties in the light of the public interest and the duty of the courts." *Warner Communications*, 435 U.S. at 602, 98 S.Ct. at 1314.

## ABUSE OF DISCRETION

We review a district court's denial of access to its records for abuse of discretion. We conclude that the reasons asserted by the district court were inadequate under *Edwards* to overcome the strong presumption in favor of copying access. *Warner Communications*, 435 U.S. at 599, 98 S.Ct. at 1312.

The district court held that three considerations militated against disclosure of the tapes. First, the court gave substantial weight to the administrative inconvenience of providing the media with accurate replicas of the tapes on a day-by-day basis as they were submitted into evidence. The court noted specifically the danger of loss or erasure of the original copies of the exhibits. Second, the court found that further publicity due to media exploitation of the tapes might complicate selection of an unbiased jury in upcoming trials. Finally, though it discounted the possibility as unlikely, the court gave some weight to the

---

6. *Warner Communications*, 435 U.S. at 602, 98 S.Ct. at 1314.

7. Courts have properly denied access when transmission of reproduced material would re-

sult in the great public embarrassment of a third party. *See, e.g., In re KSTP Television*, 504 F.Supp. 360 (D.Minn.1980) (access to tape showing acts preliminary to victim's rape denied).

risk that empanelled jurors would disobey its instructions to avoid trial publicity and be tainted by exposure to media reports broadcasting the edited tapes and editorial comment upon them.

On the present record, the considerations advanced by the district court do not justify the restraints it placed on the public's right to inspect and copy judicial records. First, before the district court rescinded its original order granting access to the taped evidence, Valley Broadcasting developed, at the clerk's direction, an unobtrusive out-of-court procedure for obtaining copies of the tapes contemporaneously with the introduction of the originals into evidence. Valley Broadcasting agreed to provide the personnel and machinery required to copy the tapes and to copy the tapes using duplicates of the original exhibits. Valley Broadcasting would bear any additional expenses of reproduction. In light of these procedures, the district court should have given little, if any, weight to its administrative burdens in this case.

We note, however, the qualified nature of our holding on this issue. In this case, duplicates of the original exhibits are in the possession of the FBI. Thus, there is no danger of loss or destruction of the original exhibits in the files of the district court. Further, we do not believe that the common law right of access requires that a district court open its files to the press and risk the loss or destruction of documents therein. The district court should carefully weigh the danger of such risks in each case where access is sought. If there is a reasonable possibility of the destruction of original exhibits, the district court could deny access. In such cases, however, we encourage the district court to consider other mechanisms to provide the public with access. The court may, for example, require the government to file duplicates of exhibits, or in the case of audio and video

tapes, the court could allow members of the public to make recordings of the tapes as they are played in court.

We also note that while Valley Broadcasting's proposed procedure is unobtrusive and administratively feasible in this case, there may be other cases in which articulable administrative difficulties warrant a denial of access.[8] Such judgments rest in the sound discretion of the district court, *Warner Communications*, 435 U.S. at 599, 98 S.Ct. at 1312, but the district court must carefully state the articulable facts demonstrating an administrative burden sufficient to deny access.

The district court also noted its concern with potential prejudice to defendants in cases yet untried, and this concern is more substantial. Initially, however, we note the limited prospect for additional prejudicial exposure resulting from access to these audio and video tapes. The media already enjoy an incontestable first amendment right to publicize and editorialize on the contents of the tapes whether or not copies are available for transmission. *See Cox Broadcasting v. Cohn*, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975). The only potential prejudice appropriate for consideration by the district court was, therefore, the added prejudice that might result from broadcasting excerpts of the tapes as opposed to simply describing their contents. While we recognize that the added danger of jury taint arising from the transmission of the tapes themselves may vary from case to case, we reemphasize that the district court must articulate the factual basis for the danger without relying on hypothesis or conjecture.

If a trial court experiences actual difficulty in the selection of its jury and if there is a yet-to-be-tried case involving related facts or issues related to the exhibits sought to be copied, the possibility of jury

---

**8.** Of course, administrative burden is only one factor for the district court to consider. We state only that cases might arise in which the administrative burdens could be a legitimate factor for denying access, and cases could arise in which the administrative burdens of access are so substantial that they justify denial on that basis alone. We need not, however, speculate on what factors might create such a burden, and accordingly, we leave the resolution of such a case for another day.

taint may rise to the level of an actual rather than a conjectural factor militating against release.[9] *See Criden,* 648 F.2d at 827. In this case, the district court noted that jury selection in the *Spilotro* case was difficult and indicated its concern that the incremental publicity caused by allowing Valley Broadcasting access to the tapes might make jury selection troublesome in related cases yet untried. But the district court did not undertake an exhibit-by-exhibit review in order to determine which, if any, exhibits sought to be copied and rebroadcast bore any relation to untried matters.[10]

We have examined the indictments submitted by the government in the "witness" case and in the "jewelry" case, and we have reviewed the transcripts of the audio and video tapes which may be introduced into evidence at trial.[11] We can find, however, only one instance in which articulable facts exist justifying a district court's denial of access. The "witness" case, for example, bears no relation to the instant action. The case arises from facts wholly apart from those involved in the *Spilotro* trial and, after the death of Spilotro, is not related to any of the contents of the audio and video tapes. The "jewelry" case involves a stolen jewelry distribution scheme completely separate from the scheme alleged in the *Spilotro* indictment. With only one exception, none of the audio and video tapes sought to be copied refers to any of the defendants in the "jewelry" case.

One of the tapes apparently does refer to Joseph C. Blasko, a named defendant in the "jewelry" case, in a manner that could be considered prejudicial. Because of the pendency of Blasko's trial in the "jewelry" case, because Blasko was formerly a detective with the Las Vegas Police Department, and because the "jewelry" case will be tried in Nevada, we conclude that the district court would have been justified in refusing access to copy that exhibit.[12] The difficulty of jury selection in the *Spilotro* case coupled with the references to Blasko in the exhibit constitutes an articulable fact not the product of conjecture. *Criden,* 648 F.2d at 827. We find, however, no other instances in which exhibits sought to be copied by Valley Broadcasting bear any significant relationship to untried matters.[13]

---

9. As Judge Weis has stated:
   > Prejudicial pretrial publicity that jeopardizes a defendant's constitutional right to a fair and impartial jury is a continuing problem for the nation's trial courts. It is obvious that the courts cannot block publication of material that the press has obtained. This is so even though the frequent invocation of customary "remedies" for prejudicial publicity neglects to recognize that their use may deprive the defendant of valued constitutional rights, such as a speedy trial, a jury of the vicinage, or a jury representing a fair cross section of the population. The inability to limit prejudicial pretrial publicity, however, does not mean that the courts are bound to contribute to it.

   *Criden,* 648 F.2d at 833 (Weis, J., concurring).

10. The district court did not consider the possibility of a retrial of these defendants to be a factor favoring a denial of access. Even if such a factor were advanced,
    > [a]s a practical matter, it must be recognized that if on appeal a new trial is ordered, considerable time will have elapsed before the case is again presented to a jury. The possibility of extensive television coverage of a retrial or of sustained public interest over that

period of time is doubtful at best. So often newsworthy events greeted with excitement today only evoke ennui tomorrow.

*Criden,* 648 F.2d at 832 (Weis, J., concurring).

11. Both the "witness" case and the "jewelry" case will proceed despite the death of Anthony Spilotro.

12. The exhibit is designated as:
    > Conversation on May 22, 1981, between:
    > Sal Romano
    > Ernie Davino
    > Leo Guardino
    > Larry Newman
    > Tony (Last Name Unknown)

    The references to Blasko appear on pages 28–29 of the transcript.

13. Absent a direct reference to a yet-to-be-tried case, we believe that any additional possibility of juror taint in an upcoming proceeding caused by granting the press access to judicial records can be overcome by using the screening device of voir dire to ensure that no juror has a preconception of a defendant's guilt. Also, if need be, the district court can grant a change of venue or continuance to avoid lingering prejudicial pub-

Finally, the district court cited, as a justification for denying media access to the tapes, the danger that jurors in the *Spilotro* trial itself might be exposed to televised reports broadcasting parts of the tapes. Although, as a practical matter, television heightens the risk that jurors will be inadvertently contaminated, the first amendment presupposes some danger of juror exposure by granting the media access to the trial. Moreover, the curious juror who disobeys his oath by watching a televised report on the trial will be contaminated whether or not the report airs footage from the tapes in evidence. The trial court is entitled to consider and weigh the likelihood of irregular jury behavior whenever to do so is not purely conjectural. However, here the district court speculated that jurors might not only violate their oaths but be incrementally prejudiced by the tapes themselves. Without articulable facts, such speculation was conjecture, and we hold that the district court abused its discretion by weighing this conjectural factor in its analysis.

Because the district court clearly erred as a matter of law by applying the test in *Belo Broadcasting* and because the factors articulated by the district court would not have supported a denial of access under *Edwards*, we grant part of the relief prayed for in Valley Broadcasting's petition for writ of mandamus.

It is therefore ORDERED that the district court grant Valley Broadcasting access, on the day the exhibits are received in evidence, to the duplicate tapes in the custody of the FBI except for tapes containing the conversations on May 22, 1981, between Sal Romano, Ernie Davino, Lee Guardino, Larry Newman and Tony (Last Name Unknown), PROVIDED Valley Broadcasting provides all personnel and machinery necessary to effect a duplication of the copies and PROVIDED Valley Broadcasting incurs any additional expenses resulting from the copying procedure, and posts a reasonable bond to assure the undamaged return of all government tapes to the Clerk of the Court immediately upon the completion of the copying.

Petition GRANTED in part, neither party to recover costs or attorney fees in this court.

licity. In our opinion, however, the district court should not make too much of the hypothetical future-arising need to resort to such extreme curative devices. "[D]efendants, as well as the news media, frequently overestimate the extent of the public's awareness of news." *Myers,* 635 F.2d at 953; *see also Columbia Broadcasting System v. United States District Court,* 729 F.2d 1174, 1179 (9th Cir.1984).

The risk of future juror prejudice is particularly small in this case when, by the government's own admission, the evidence is being used "primarily as corroboration for live witnesses on secondary points." Further, the only tape "actually showing a crime was a reel-to-reel ... video surveillance of a burglary, showing murky figures on a rooftop."