**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Raymond D. CHEELY, Jr.; Douglas P. Gustafson, Defendants–Appellees.**

Nos. 92–30257, 92–30504.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted August 6, 1993.

Decided April 11, 1994.

Amended Oct. 3, 1994.

·Wevley William Shea, U.S. Atty., District of Alaska, Anchorage, AK, James S. Reynolds, Dept. of Justice, John F. De Pue, Dept. of Justice, Mark H. Bonner, Asst. U.S. Atty., Mary Incontro, Tammy Haimov, Dept. of Justice, Washington, DC, for plaintiff-appellant.

Nancy Shaw, Federal Public Defender, Anchorage, AK, Richard Kammen, McClure, McClure & Kammen, Indianapolis, IN, James H. McComas, Schleuss & McComas, Richard H. Friedman, Friedman & Rubin, Rich Curtner, Asst. Public Defender, Anchorage, AK, for defendants-appellees.

Before: SCHROEDER, FLETCHER, and ALARCON, Circuit Judges.

Opinion by Judge FLETCHER; Concurrence and Dissent by Judge ALARCON.

## ORDER

Although no petition for rehearing was filed, and no request for en banc rehearing was made by the parties, a member of the court requested en banc rehearing of this appeal. The request was put to a vote of all active non-recused judges. The request did not secure the required majority vote of the active non-recused members of the court.

The panel, of its own motion, called for supplemental briefs on the possible effect of the Supreme Court's decision in *Davis v. United States,* — U.S. ——, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) on its affirmance of the district court order to suppress Cheely's statements to postal inspectors. It now, by this order, reaffirms its holding but modifies the opinion, *United States v. Cheely,* 21 F.3d 914 (9th Cir.1994): [Editor's Note: Amendment incorporated for purposes of publication].

No petition for rehearing will be entertained. The mandate shall issue forthwith.

## OPINION

FLETCHER, Circuit Judge:

The government brings an interlocutory appeal to challenge the district court's pretrial rulings that (1) Cheely cannot be subjected to the death penalty, and (2) Cheely's statements to investigating postal inspectors are inadmissible at trial because his *Miranda* rights were violated. We affirm.

### PROCEDURAL HISTORY

Before the commencement of trial, the district court directed the parties to address the applicability of the capital punishment provisions of the relevant federal statutes. It did this because several procedures different from those for an ordinary criminal trial would be implemented were this a death penalty case. For example, Cheely would be entitled to extra peremptory challenges if the offenses for which he is charged are "punishable by death," Fed.R.Crim.P. 24(b), and he would also be entitled to have two attorneys represent him. 18 U.S.C. § 3005 (1988). The government, on the other hand, would be allowed to seek a "death qualified" jury, one free of jurors so absolutely opposed to the death penalty that they would not impose it regardless of the strength of the government's case. *Cf. Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

The district court had jurisdiction under 18 U.S.C. § 3231 (1988). It decided that the capital sentencing provisions under which Cheely was charged were unconstitutional, and that Cheely's statements to the postal inspectors should be suppressed. We have jurisdiction to hear the government's timely filed appeal of both issues. The provisions of 18 U.S.C. § 3731 (1988) are "intended to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit." *United States v. Woolard,* 981 F.2d 756, 757 (5th Cir.) (finding jurisdiction under § 3731 to review district court's order striking death as a per-

missible punishment for violation of 18 U.S.C. §§ 2, 1111, 1114), *reh'g en banc denied,* 990 F.2d 819 (5th Cir.1993);[1] *United States v. Dominguez–Villa,* 954 F.2d 562, 564 (9th Cir.1992) (government may appeal adverse ruling on suppression motion).

### DISCUSSION

#### I. Challenge to the Death Penalty

##### A. Factual Background

In 1991, Cheely and Gustafson[2] were convicted of Jeffrey Cain's murder. George Kerr, a key witness at the trial, testified that he was in the car with Cheely and Gustafson when they shot and killed Cain. The indictment on which Cheely and Gustafson currently await trial alleges that, after their convictions for the Cain homicide, they devised plans to kill Kerr and others who participated in the trial. From behind bars, Cheely and Gustafson allegedly instructed Gustafson's older brother and sister in the construction of a mail bomb, which they directed be mailed to Kerr's Post Office box in Chugiak, Alaska. Kerr's parents, who were collecting his mail while he was out of the state, opened the box containing the mail bomb. David Kerr, George's father, was killed. Michelle Kerr, George's mother, was seriously injured. Cheely, Gustafson, and Gustafson's siblings were subsequently indicted for, among other things, the mail bomb murder of David Kerr.

##### B. Constitutionality of Capital Sentencing Provisions

■ We first consider Cheely's constitutional challenge to the capital provisions under which he was charged, 18 U.S.C. §§ 844(d) and 1716(a) (1988). A challenge to the constitutionality of capital statutes presents a question of law; we review de novo the district court's resolution of this question. *McKenzie v. Risley,* 842 F.2d 1525, 1538 (9th Cir.) (en banc), *cert. denied,* 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988).

---

1. Alternatively, we may treat the appeal of this issue as an application for a writ of mandamus. *United States v. Harper,* 729 F.2d 1216, 1219–24 (9th Cir.1984).

2. On April 6, 1993, the government and Gustafson stipulated to the dismissal of Gustafson's appeal.

### 1. Death Penalty Jurisprudence

■ Prior to *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), "sentencing juries had almost complete discretion in determining whether a given defendant would be sentenced to death." *Johnson v. Texas*, — U.S. —, —, 113 S.Ct. 2658, 2664, 125 L.Ed.2d 290 (1993).[3] *Furman* held that a death sentence imposed by a jury exercising unbridled discretion as to whether death should be the penalty constitutes cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Capital punishment is unconstitutional when it is "wantonly and ... freakishly imposed," *Furman*, 408 U.S. at 310, 92 S.Ct. at 2763 (Stewart, J., concurring), pursuant to statutes that provide "no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* at 313, 92 S.Ct. at 2764 (White, J., concurring); *see also Gregg v. Georgia*, 428 U.S. 153, 196 n. 47, 96 S.Ct. 2909, 2936 n. 47, 49 L.Ed.2d 859 (1976) ("[W]here the ultimate punishment of death is at issue a system of standardless jury discretion violates the Eighth and Fourteenth Amendments.") (Stewart, Powell, and Stevens, JJ); *Woodson v. North Carolina*, 428 U.S. 280, 302, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976) ("Central to the limited holding in *Furman* was the conviction that the vesting of standardless sentencing power in the jury violated the Eighth and Fourteenth Amendments.") (Stewart, Powell, and Stevens, JJ, concurring).

The post–*Furman* death penalty jurisprudential framework can be quickly sketched. *See Blystone v. Pennsylvania*, 494 U.S. 299, 308–09, 110 S.Ct. 1078, 1084, 108 L.Ed.2d 255 (1990) (quoting *McCleskey v. Kemp*, 481 U.S. 279, 305–06, 107 S.Ct. 1756, 1774, 95 L.Ed.2d 262 (1987)). Beyond the threshold requirement that death must be a penalty proportionate to the crime for which the defendant is convicted,[4] a statute that includes capital punishment as a possible penalty (1) must "genuinely narrow the class of persons eligible for the death penalty and ... reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder," *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983), and (2) must not "prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty." *Penry v. Lynaugh*, 492 U.S. 302, 318, 109 S.Ct. 2934, 2946–47, 106 L.Ed.2d 256 (1989).

The Court noted in *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), that the requisite narrowing could be accomplished in one of two ways: either "[t]he legislature may itself narrow the definition of capital offenses ... so that the jury finding of guilt responds to this concern,"[5] or "the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase." *Lowenfield*, 484 U.S. at 246, 108 S.Ct. at 555.[6]

---

**3.** For example, this jury instruction was approved by the Supreme Court in a 1948 decision:

> [Y]ou may return a qualified verdict in this case by adding the words "without capital punishment" to your verdict. This power is conferred solely upon you and in this connection the [c]ourt can not extend or prescribe to you any definite rule defining the exercise of this power, but commits the entire matter of its exercise to your judgment.
>
> ....
>
> ... [Y]ou are authorized to add to your verdict the words "without capital punishment," and this you may do no matter what the evidence may be....

*Andres v. United States*, 333 U.S. 740, 743–44 & n. 4, 68 S.Ct. 880, 881–82 & n. 4, 92 L.Ed. 1055 (1948).

**4.** *See, e.g., Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (death is disproportionately severe penalty for rape of adult woman).

**5.** *Lowenfield* upheld Louisiana's capital sentencing scheme because it satisfied the former of these two conditions: the statute itself sufficiently narrowed "the class of death-eligible murderers." 484 U.S. at 246, 108 S.Ct. at 555; *see also Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).

**6.** In *Gregg*, the Court upheld Georgia's revised capital sentencing scheme, which required the jury to find certain, statutorily-specified aggravating circumstances before it could impose the death penalty. 428 U.S. at 162–63, 96 S.Ct. at 2920.

### 2. Constitutionality of §§ 844(d) and 1716(a)

The statutory provisions under which the government seeks the death penalty for Cheely are as follows:

### § 844. Penalties

. . . .

**(d)** Whoever transports or receives, or attempts to transport or receive, in interstate commerce or foreign commerce any explosive with the knowledge or intent that it will be used to kill, injure, or intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property, shall be imprisoned for not more than ten years, or fined not more than $10,000, or both; and if ... death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment as provided in section 34 of this title.[7]

18 U.S.C. § 844(d) (1988).

### § 1716. Injurious articles as nonmailable

**(a)** [A]ll explosives, inflammable materials, infernal machines, and mechanical, chemical, or other devices or compositions which may ignite or explode, ... are nonmailable matter and shall not be conveyed in the mails....

. . . .

Whoever knowingly deposits for mailing or delivery, or knowingly causes to be delivered by mail, ... anything declared nonmailable by this section, whether or not transmitted in accordance with the rules ... with intent to kill or injure another, or injure the mails or other property, shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.

Whoever is convicted of any crime prohibited by this section, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct....

18 U.S.C. § 1716(a), undesignated paragraphs following (i) (1988).

These provisions authorize the death penalty not only for persons who murder by means of mail bomb, but also for a much broader class of less culpable persons. Because these provisions require only an intent to damage property, transmission of explosive or inflammable material through the mail, and a resulting death, they are broad enough to authorize death for persons guilty of no more than involuntary manslaughter. Suppose, for instance, one person mails another an explosive or inflammable substance in furtherance of a joint plan to blow a crater in the local college's football field, to protest the ascendancy of athletics over academics. If for any reason the substance accidentally explodes while en route,[8] and a person dies as a result, both conspirators could be sentenced to death.

This scenario raises at least two constitutional problems. First, in such circumstances the death penalty would be disproportionately severe.[9] Cheely is not in a position to advance this argument, however, as he is charged with the intentional murder of David Kerr.[10]

---

**7.** Section 34 of title 18, entitled "[p]enalty when death results," provides that "[w]hoever is convicted of any crime prohibited by this chapter, which has resulted in the death of any person, shall be subject also to the death penalty or to imprisonment for life, if the jury shall in its discretion so direct." 18 U.S.C. § 34 (1988).

**8.** The statute does not require that the defendant's behavior be reckless, that the accident be reasonably foreseeable, or that the defendant even know the material is capable of exploding.

**9.** The *least* culpable mental state the Supreme Court has held death-eligible is reckless indiffer-

ence to human life during commission of a felony. *Tison v. Arizona*, 481 U.S. 137, 157–58, 107 S.Ct. 1676, 1687–88, 95 L.Ed.2d 127 (1987).

**10.** Cheely does not contend that death would be a disproportionate penalty for the crime he is alleged to have committed. He argues, however, that because the mail bomb statutes authorize death for a vast number of acts which could not pass the proportionality requirement, they are defective for that reason alone. While this type of challenge would be permissible in the First Amendment context where chilling effect on protected conduct or speech is a concern, we cannot entertain it here. "Embedded in the traditional

Second, under the statute one jury could sentence the football field bombers to death, while another could reject the death penalty in a case where a paid assassin successfully used a mail bomb to murder an NAACP leader. The prospect of such "wanton" and "freakish" death sentencing is intolerable under *Furman* and the cases following it. The constitutional defect in sections 844(d) and 1716(a) is that they create the potential for impermissibly disparate and irrational sentencing because they encompass a broad class of death-eligible defendants without providing guidance to the sentencing jury as to how to distinguish among them.[11]

The gravamen of the government's argument, and that of the dissent, is that in defining the death-eligible conduct these sections sufficiently narrow the class of death-eligible persons, and thus that no further guidance to the jury is required. Given the potential for such extreme disparities as those between the football field bombers and the NAACP assassin, we cannot agree.[12] In evaluating sections 844(d) and 1716(a), we do not find the requisite statutory narrowing that the Court found adequate in *Lowenfield* and *Jurek*.

In *Lowenfield* and *Jurek*, the Supreme Court upheld the capital sentencing schemes of Louisiana and Texas. These schemes authorized the death penalty if the jury found the defendant guilty of murder under partic-

ularly aggravated circumstances. Specifically, death was authorized where the defendant murdered certain types of persons (e.g., children, police officers, prison guards), where the murder was committed with a particularly heinous state of mind (e.g., with intent to kill more than one person, as a paid assassin, or in the course of torture), or where the murder was committed in the course of an aggravated felony. *See Lowenfield*, 484 U.S. at 242–43, 108 S.Ct. at 553–54; *Jurek*, 428 U.S. at 265–66, 96 S.Ct. at 2953–54; *see also Gregg*, 428 U.S. at 165–66, 96 S.Ct. at 2921–22 (aggravating circumstances in Georgia's capital sentencing scheme); *McKenzie*, 842 F.2d at 1538 n. 26 (aggravating circumstances in Montana's capital sentencing scheme).

The statutory scheme approved in *Gregg* was different from those in *Jurek* and *Lowenfield* but it achieved the same result: by first marking out a broad category of murderers, and then authorizing the jury to impose death only upon certain, well-defined subclasses involving highly aggravating factors, the scheme avoided the possibility of arbitrary sentencing abhorred in *Furman*. In contrast, sections 844(d) and 1716(a) neither require the jury to find any of the aggravating factors present in *Gregg*, nor account for these factors directly in their definitions of death-eligible conduct, as did the statutes in *Jurek* and *Lowenfield*. In-

---

rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the [c]ourt." *Broadrick v. Oklahoma*, 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973).

**11.** The dissent wrongly asserts that just as Cheely is without standing to bring a proportionality challenge on behalf of those convicted of less serious crimes than he, he also may not refer to such persons in his *Furman* challenge. Dissent at 11922–25. However, a challenge under *Furman* is a challenge to the capital sentencing regime as a whole, not its application to a particular defendant. The Supreme Court has not hesitated under *Furman* to invalidate capital sentencing schemes challenged by defendants who had been convicted of first-degree murder. *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v.*

*Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976); *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Even those convicted of heinous crimes, if they face the death penalty, have a constitutional right to be sentenced in the consistent, rational manner prescribed by *Furman*.

**12.** Throughout, the dissent persists in pressing an analysis based on the faulty premise that sections 844(d) and 1716(a) authorize the death penalty only for "a vicious type of killer" with "depraved intent." Dissent at 1458–59. At one point, it asserts that Congress limited the death penalty "to a person who has sent an explosive device through the mails with *the intent to injure or kill* the recipient and has succeeded in his plan." *Id.* at 1456–57 (emphasis added). That is simply untrue. Section 844 requires only the knowledge or intent that the device "will be used to ... intimidate any individual or unlawfully to damage or destroy any building, vehicle, or other real or personal property." 18 U.S.C. § 844(d).

deed, these sections do not even restrict their focus to murderers, but rather sweep within their coverage those guilty of no more than involuntary manslaughter.[13]

The government argues that these sections genuinely narrow the class of death-eligible persons because they authorize the death penalty only for those relatively few persons who use mail bombs.[14] This argument reveals a fundamental misunderstanding of the caselaw. Narrowing is not an end in itself, and not just any narrowing will suffice. The narrowing must be such that it forecloses the prospect of the cruel and unusual punishment from "wanton or freakish" imposition of the death penalty. When juries are presented with a broad class, composed of persons of many different levels of culpability, and are allowed to decide who among them deserves death, the possibility of aberrational decisions as to life or death is too great. The statute before us is unconstitutional because it utterly fails to foreclose this prospect.

The dissent argues at some length that because Congress can legislate only in respect to federal crimes, and must therefore focus on murder by mail bomb rather than murder generally, the requisite narrowing has been accomplished by virtue of the statute's limited jurisdiction. Dissent at 1455–57. We disagree. Surely, the death penalty cannot be imposed for any and every intentional act which is susceptible to federal legislative jurisdiction and which results in a death. Whether statutes are state or feder-al, in narrowing the class of death-eligible defendants, they must focus on the type of aggravating factors described in *Lowenfield*, *Jurek*, and *Gregg*, not on mere jurisdictional prerequisites.[15]

The government also argues that sections 844(d) and 1716(a) are like the capital sentencing provisions in *Jurek* and *Lowenfield* in that they narrow the class of death-eligible persons to those who cause "a risk of death or great bodily harm to more than one person," and to those who kill a public official. Appellant's Opening Brief at 25. However, these factors have been held to adequately "narrow[ ] the class of death-eligible *murderers*," not a broader class of those who may be guilty of murder *or* involuntary manslaughter. *Lowenfield*, 484 U.S. at 246, 108 S.Ct. at 555 (emphasis added). Moreover, sections 844(d) and 1716(a) do not in fact require a finding of risk to more than one person, reckless disregard for human life,[16] or the death of a public official. Again, these sections are nothing like the capital sentencing provisions upheld in *Jurek* and *Lowenfield*.

Finally, we also agree with Cheely's contention that *United States v. Harper*, 729 F.2d 1216 (9th Cir.1984), cuts against the government's claim that sections 844(d) and 1716(a) are sufficiently narrow because they limit their focus to homicides that result from the mailing of prohibited materials. In *Harper*, we held unconstitutional the capital sentencing provision of the Espionage Act, 18 U.S.C. § 794(a) (1982).[17] Cheely persuasive-

13. This is not particularly surprising in a statute enacted prior to *Furman*. Such statutes typically marked out a large class of death-eligible persons, and left it to the jury to decide who among this class would be subject to the death penalty. For this reason the dissenting Justices in *Furman* feared the Court's ruling meant that "if ... the Congress wish[es] to maintain the availability of capital punishment, significant statutory changes will have to be made." *Furman*, 408 U.S. at 400, 92 S.Ct. at 2809 (Burger, C.J., dissenting).

14. Cheely points out that this is equivalent to arguing that "[a] state could ... save its capital sentencing scheme simply by subdividing the homicide section of its criminal code to provide, for example, for murder by gun, murder by knife, by burning ... etc." Appellee's Brief at 28.

15. Had the mail bomb statutes provided, for instance, that the sentence of death could be imposed only where serious bodily harm or death were intended, we would agree that Congress had sufficiently narrowed the class of death-eligible defendants. In such a case, the class of death-eligible defendants would be narrowed to those who had the mens rea of murderers, and whose chosen method of killing was both felonious and highly dangerous to third parties. The statutes before us now, however, do not accomplish such narrowing.

16. *Tison* held that death was a proportionate penalty in cases involving reckless disregard for human life during commission of a felony. 481 U.S. at 155–58, 107 S.Ct. at 1687–88. In contrast, the capital provisions before us now authorize the death penalty for a much less culpable mental state: intent to damage property.

17. As quoted in *Harper*, § 794(a) provided that
(a) Whoever, with intent or reason to believe that it is to be used to the injury of the United

ly contends that "[i]f the provision of potential capital consequences ... in the Espionage Act is unconstitutional, as the *Harper* court held ... then, *a fortiori*"—because "[i]t is difficult to conceive of an offense category more narrow than espionage"—the death penalty provisions of §§ 844(d) and 1716(a) must also be unconstitutional. Appellee's Brief at 32.[18]

We affirm the district court's determination that the death penalty provisions in 18 U.S.C. §§ 844(d) and 1716(a) are unconstitutional because they do not "genuinely narrow the class of persons eligible for the death penalty," *Zant,* 462 U.S. at 877, 103 S.Ct. at 2742, and because they set the stage for capital punishment which may be "wantonly and ... freakishly imposed." *Furman,* 408 U.S. at 310, 92 S.Ct. at 2763 (Stewart, J., Concurring).[19]

## II. *Motion to Suppress Evidence*

### A. *Factual Background*

■ On September 20, 1991, three days after the mail bomb explosion, postal inspectors Glenn Porter and David Hertle visited Cheely at the Cook Inlet Pretrial Facility in Anchorage, where Cheely is serving a sixty-year sentence in the state prison system for the murder of Jeffrey Cain.

Porter and Hertle were among the postal inspectors detailed to execute a warrant to search Cheely's person, his property, and his cell for evidence pertaining to the Kerr bombing,[20] and to interview him regarding the incident. After conducting the search, Porter and Hertle advised Cheely that they wanted to talk to him. Cheely responded that he had been expecting them. The inspectors next advised Cheely of his rights, utilizing a "Form 1067" with a "warning" section identical in all material respects to the "advice of rights" form approved in *United States v. Fouche,* 833 F.2d 1284, 1286 n. 2 (9th Cir.1987) (*"Fouche II"* ), cert. denied, 486 U.S. 1017, 108 S.Ct. 1756, 100 L.Ed.2d 218 (1988).

Cheely acknowledged that he understood his rights and signed on a line directly beneath the warning section. Form 1067 also includes a "waiver" section, which reads: "I am willing to discuss subjects presented and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me." Cheely declined to sign the waiver.

States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blueprint, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by death or by imprisonment for any term of years or for life.
*Harper,* 729 F.2d at 1218 n. 1 (quoting 18 U.S.C. § 794(a)).

18. The dissent argues that the statute before us now is more narrowly drawn than the Espionage Act. Dissent at 1457–58. But the only distinguishing feature noted by the dissent is that the present statute requires a resulting death. According to the dissent, *Harper* should have held the Espionage Act unconstitutional because, in imposing death on persons who had not caused any loss of human life, it failed to satisfy threshold proportionality requirements. *Id.* at 1457 n. 3. This may or may not be true. *Coker v. Georgia* does not foreclose the possibility that grave injury to the interests of the United States would suffice. For *Furman* purposes, in any case, the homicide requirement of the statutes before us does not make *Harper* 's rationale inapplicable.

19. In light of the above discussion, we need not address Cheely's claim that the statutes "prevent the sentencer from considering and giving effect to evidence relevant to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty." *Penry v. Lynaugh,* 492 U.S. at 318, 109 S.Ct. at 2946–47. We note, however, that sections 844(d) and 1716(a) make no mention whatever of mitigating factors; since *Furman* neither the Supreme Court nor this court has upheld such an open-ended capital sentencing scheme.

20. For instance, Cheely reputedly had written out a "hit list" that he kept in his cell, targeting individuals involved in the prosecution of the Cain homicide.

The two inspectors' versions of what transpired next are consistent.

*Porter:*

Q [by the prosecutor] Did [Cheely] say anything with regard to declining to sign the waiver portion of the form?

A He did tell us that he—his attorney had advised him not to talk to us.

Q What did you say, if anything, at that point?

A We asked him, with that being the case, did he want to talk to us about the—about the case, and he told us that he appreciated us coming down to talk to him. He also told us that he had tried to talk to the Anchorage Police Department when this thing went down back in October of '90.

*Hertle:*

Q [by the prosecutor] What about the waiver portion of [Form 1067], on the bottom. Just tell us what happened with regard to that.

A [Cheely] told me that he didn't think he need—he told me that he didn't think he wanted to sign that.

Q Well, did you read it to him?

A I read him the waiver, yes.

Q And then what happened after you read it to him? Did you ask him anything?

A Well, he told me that he didn't think his attorney would want him talking to us, and I said to him, 'With that in mind, would you still want to talk with us?'

Q What did he say?

A He said he sure—he said he appreciated the postal inspectors coming to visit with him, and then he started to tell us, back in October of 1990, that he'd wanted to talk to Anchorage Police Department regarding the homicide case at that time, and they refused to talk to him.

During the initial stages of the interview, Inspector Porter took notes. Porter testified that, when Cheely realized notes were being taken, "once again he said that his attorney had advised him not to talk to us, ... and he was concerned about my taking notes." Her-

tle, in his testimony, does not mention the second reference by Cheely to his attorney's advice, recalling merely that Cheely told them that "[h]e would be comfortable to continue the conversation as long as we were not taking notes of that conversation." Porter stopped taking notes at that point. The "conversation," during which Cheely asked the inspectors several questions, lasted approximately two hours. The government acknowledges that although Cheely did not confess, he made several incriminating statements.

### B. *Analysis*

The essential facts underlying the district court's decision to suppress Cheely's September 20, 1991 statements are not in dispute. We review the district court's legal conclusion that there was no waiver and that Cheely's *Miranda* rights were violated de novo. *See United States v. Homick,* 964 F.2d 899, 903 (9th Cir.1992).

■ As an initial matter, it is clear that the inspectors' "conversation" with Cheely was a custodial interrogation. In *Cervantes v. Walker,* 589 F.2d 424 (9th Cir.1978), this court characterized *Mathis v. United States,* 391 U.S. 1, 4–5, 88 S.Ct. 1503, 1505, 20 L.Ed.2d 381 (1968), as deciding that *Miranda* warnings were required where a prisoner was questioned "by a government agent, not himself a member of the prison staff, on a matter not under investigation within the prison itself" because that questioning "constituted an additional imposition on his limited freedom of movement." *Cervantes,* 589 F.2d at 428. Here, Cheely was interrogated and searched by postal inspectors executing a warrant and investigating a mail bomb murder that occurred outside the prison walls. He was taken from his cell at the Cook Inlet facility to a locked room, where he was strip searched and then questioned for two hours. This is, without a doubt, custodial interrogation.

■ Of course, Cheely does not necessarily invoke his rights simply by saying the magic word "attorney"; that word "has no talismanic qualities," and "[a] defendant does not invoke his right to counsel any time the

word falls from his lips." *United States v. Jardina,* 747 F.2d 945, 949 (5th Cir.1984), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 833 (1985). Similarly, an express written or oral waiver of the right to counsel "is not inevitably either necessary or sufficient to establish waiver." *North Carolina v. Butler,* 441 U.S. 369, 373, 99 S.Ct. 1755, 1757, 60 L.Ed.2d 286 (1979).

■ In combination, however, Cheely's written acknowledgment that he understood his rights, his refusal to sign the waiver portion of Form 1067, and his explanation of that refusal—my attorney does not want me to talk to you—amount to an invocation of his rights under *Edwards v. Arizona.* "[H]aving expressed his desire to deal with the [postal inspectors] only through counsel, [Cheely] is not subject to further interrogation by the authorities until counsel has been made available to him. . . ." *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378 (1981). Cheely's continued response to questions from Porter and Hertle after invoking his right to counsel does not constitute waiver of the right. *See Smith v. Endell,* 860 F.2d 1528, 1529 (9th Cir.1988) (citing *Edwards* ), *cert. denied,* 498 U.S. 981, 111 S.Ct. 510, 112 L.Ed.2d 522 (1990).

Subsequent to the filing of the opinion in this appeal, the Supreme Court decided *Davis v. United States,* — U.S. —, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). We called for supplemental briefing from the parties as to the effect *Davis* might have on our conclusion that Cheely had unequivocally invoked his right to counsel and that the inspector's inquiry as to whether Cheely wanted to talk, despite his attorney's advice, was improper once Cheely invoked his right to counsel. We now reaffirm the district court's grant of Cheely's motion to suppress. The factual differences between the two cases are striking. Davis waived his right to counsel both orally and in writing. Cheely declined to waive his right to counsel either orally or in writing. Davis was interrogated for half an hour before he said, "Maybe I should talk to a lawyer." Asked if he were making a comment or asking for a lawyer, he responded, "No, I am not asking for a law-

yer" followed by, "No, I don't want a lawyer."

In contrast to Cheely who unequivocally *refused* to waive his right to counsel, Davis unequivocally *waived* his right and then, after a period of questioning, equivocated as to whether he should ask for counsel and said he was not asking for counsel. The *Davis* court saw "no reason to disturb [the lower court's] conclusion" that "petitioner's remark to the NIS agents [ ] was not a request for counsel."

*Id.* at —, 114 S.Ct. at 2357. We see no reason here to disturb the district court's conclusion that Cheely had invoked his right to counsel.

■ Finally, 18 U.S.C. § 3501 (1988), which provides that a confession or "any self-incriminating statement" shall be admissible at trial if "voluntarily given," *id.* at § 3501(a), (e), does not, as the government argues, trump *Edwards.* Cheely's statements were "unconstitutionally elicited after he had invoked his right[ ] to counsel . . . , [and] it is [thus] irrelevant that [Cheely's] subsequent [incriminating statements] w[ere] voluntary." *See Desire v. Attorney General,* 969 F.2d 802, 805 (9th Cir.1992).

## CONCLUSION

The district court correctly determined that the death penalty provisions of 18 U.S.C. §§ 844(d) and 1716(a) are unconstitutional. It also correctly granted Cheely's motion to suppress.

AFFIRMED.

ALARCON, Circuit Judge, concurring and dissenting:

The majority has concluded that Congress violated the Eighth Amendment by making punishable by death the intentional killing of a human being by sending a bomb through the United States mails. In reaching this result, the majority has ignored the presumption that "a punishment selected by a democratically elected legislature is constitutionally valid." *Campbell v. Wood,* 18 F.3d 662, 682, 1994 U.S.App. LEXIS 1964, at *1964 (9th Cir. Feb. 8, 1994) (en banc).

I respectfully dissent because, in enacting sections 844(d) and 1716(a), Congress limited the death penalty to those who kill in a particularly appalling and heinous manner. As applied to Cheely, these statutes fully comply with the Eighth Amendment as interpreted by the Court in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988).

## I. The Indictment

Cheely was indicted on April 14, 1992. The indictment alleges in Count 1 that

[o]n or about September 17, 1991, in the District of Alaska, defendants Raymond D. Cheely, Jr., Douglas P. Gustafson, Peggy Gustafson Barnett and Craig A. Gustafson knowingly and with intent to kill and cause injury to another, deposited for mailing and caused to be delivered by mail according to the direction thereon, a package addressed to George Kerr, Post Office Box 671091, Chugiak, Alaska, 99567, containing material which was nonmailable, to wit: explosives contained in a mail bomb designed to explode upon opening the package in which it was sent, which resulted in the death of Mr. David L. Kerr and in injury to Mrs. Michelle T. Kerr.

All of which is in violation of and contrary to Title 18, United States Code, Section 1716(a) and (2).

Count 4 of the indictment charges that

[o]n or about September 13, 1991, in the District of Alaska, defendants Raymond D. Cheely, Jr., Douglas P. Gustafson, Peggy Gustafson Barnett and Craig A. Gustafson transported through the United States mails in interstate commerce an explosive contained within a package addressed to George Kerr, Post Office Box 671091, Chugiak, Alaska, 99567, said explosive being designed to detonate upon the opening of the package, with the knowledge and intent that the explosive would be used to kill, injure, and intimidate an individual, and which did, in fact, cause the death of Mr. David L. Kerr.

All of which is in violation of and contrary to Title 18, United States Code, Section 844(d).

Unlike the majority's negligent idealist whose sole goal was to damage a football field, Cheely is charged in Count 1 with sending an explosive device through the mails with the intent to injure and kill the person who opened the package. In Count 4, Cheely is charged with sending an explosive device intentionally designed to kill the recipient. The indictment in each count expressly alleges that Cheely acted with the intent to kill another human being. Our responsibility in this case is to determine whether the death penalty can be applied to a person who committed *the crime described in the indictment.*

## II. The Presumptive Constitutional Validity of Sections 844(d) and 1716(a)

The majority correctly explains that we cannot defer to the trial judge's interpretation of the Eighth Amendment, nor to the district court's determination that Congress exceeded its constitutional powers in enacting sections 844(d) and 1716(a). In carrying out our independent appellate responsibility in reviewing a constitutional challenge to the punishment prescribed by Congress, we must faithfully apply the decisions of this nation's highest court. These decisions instruct us that we must presume that Congress lawfully performed its constitutional duties. In *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court cautioned courts charged with determining the constitutionality of a death penalty statute as follows:

[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, *we presume its validity.* We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And *a heavy burden rests on those who would attack the judgment of the representatives of the people.*

*Id.* at 175, 96 S.Ct. at 2926 (emphasis added).

Cheely does not argue that the death penalty is cruelly inhumane. Instead, Cheely contends that these statutes are unconstitu-

tional because they cover "a wide range of acts ... where there is no intent to kill, but solely the intent to damage property." Appellee's Brief at 29. Although never acknowledged by the majority, it is Cheely who bears the heavy burden of demonstrating that section 844(d) and section 1716(a) are unconstitutional. He has not met that burden.

### III. Cheely Lacks Standing to Challenge the Statute as Applied to Others

Cheely contends that sections 844(d) and 1716(a) do not meet the narrowing requirement imposed by the Eighth Amendment because they are so broad in their scope that they would permit a jury to recommend the death penalty arbitrarily and capriciously, in violation of the Supreme Court's decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

In adopting Cheely's contention, the majority argues that the statutes are unconstitutional because the jury in this matter will be presented "with a broad class, composed of persons of many different levels of culpability, and [will be] allowed to decide who among them deserves death." Majority opinion at 1445. The majority maintains that "[t]he statute before us is unconstitutional because it utterly fails to foreclose this prospect." *Id.* The majority concludes that the statutes permit a wanton and freakish application of the death penalty in violation of the Eighth Amendment because they "are broad enough to authorize death for persons guilty of no more than involuntary manslaughter." *Id.* at 1443.

The majority's analysis confuses the requirement that statutes narrow the class of persons subject to the death penalty with the rule prohibiting a punishment that is grossly disproportionate to the crime involved. *See Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1976). In *Coker*, the Supreme Court held that the death penalty was a grossly disproportionate and excessive punishment for the crime of rape. *Id.* In this matter, the majority essentially

concludes that the statutes at issue may subject to the death penalty persons for whom death would similarly be a disproportionate punishment. For the majority, this demonstrates that the statutes fail to narrow the class of persons eligible for the death penalty. However, this line of analysis more properly relates to the question of proportionality, a requirement which is fulfilled in this case. As the district court noted in its June 3, 1992 minute order: "[T]he defendants are charged with what would have been premeditated murder at common law.... Consequently, their crime, if proved to the satisfaction of a petit jury, satisfies the proportionality analysis employed by the United States Supreme Court." Minute Order from Chambers at 1–2 (June 3, 1992).

Furthermore, the majority's analysis ignores the fact that Cheely was not charged with conduct that might be characterized as involuntary manslaughter. He is charged with what would have been identified as an especially vicious form of deliberate, premeditated, intentional murder at common law. This stands in stark contrast to the straw man created and triumphantly destroyed by the majority.

The majority argues that a sentence of death would be "impermissibly disparate and irrational" for a person who unintentionally kills a human being with an explosive device sent through the mails as part of an academic protest. Majority opinion at 1444. The Supreme Court instructed us long ago, however, that we lack the jurisdiction to give advisory opinions on hypothetical questions. Our authority is limited to actual cases and controversies presented by persons who have a concrete interest in the outcome of the litigation because of an alleged or threatened injury. The constitutionality of the portions of these statutes that make an intentional killing punishable by death is the sole issue before this court. Cheely simply lacks standing to challenge these statutes "on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the [c]ourt." [1] *Broadrick v.*

---

1. The majority argues that Cheely has standing to attack these statutes because "[e]ven those convicted of heinous crimes ... have a constitution-

al right to be sentenced in the consistent, rational manner prescribed in *Furman*." Majority opinion at 1444 n. 11. Although this statement is

*Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). Accordingly, the distracting hypothetical posed by the majority concerning the impact of these statutes on a bumbling academic protestor who kills unintentionally is not properly before this court under the clear teaching of *Broadrick.*

## IV. Eighth Amendment Jurisprudence

### A. *Furman v. Georgia*

An examination of the development of Eighth Amendment jurisprudence readily demonstrates that the challenged statutes meet the narrowing requirement first recognized by the Supreme Court's plurality opinion in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In *Furman,* the defendants were convicted and sentenced under Georgia statutes which permitted the trier of fact to select the punishment of death or a lighter punishment in its unfettered discretion. *Id.* at 240, 92 S.Ct. at 2727 (Douglas, J., concurring). Three members of the Court concluded that the failure of the Georgia statutes to guide the jury in the exercise of its discretion violated the Eighth and Fourteenth Amendments. *Id.* at 256–57, 92 S.Ct. at 2735 (Douglas, J., concurring) ("[T]hese discretionary statutes are unconstitutional in their operation."); *id.* at 310, 92 S.Ct. at 2763 (Stewart, J., concurring) ("I simply conclude that the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and freakishly imposed."); *see id.* at 313, 92 S.Ct. at 2764 (White, J., concurring) ("[A]s the statutes before us are now administered, the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice."). Justice Brennan and Justice Marshall were of the view that capital punishment is cruel and unusual, and therefore cannot be imposed for any crime. *Id.* at 305, 92 S.Ct. at 2760 (Brennan, J., concurring); *id.* at 360, 92 S.Ct. at 2788 (Marshall, J., concurring).

Left unresolved by *Furman* was the question whether the narrowing of the jury's discretion could be performed by the definition of the crime itself, or whether it was necessary for the statute to recite a specific set of factors to guide the trier of fact's discretion in making its sentencing decision, after finding the defendant guilty of a homicide. In subsequent decisions, the Court has held that the narrowing function can be provided in the definition of the crime applied during the guilt phase of trial, or in the specification of aggravating circumstances to be considered during sentencing proceedings.

### B. *Georgia's Response to Furman v. Georgia*

Following the Court's determination that its capital punishment *procedures* were unconstitutional, Georgia amended its laws to place limitations on the jury's discretion in capital cases. Although no change was made in the *definition* of the felonies for which a person could receive the death penalty, *Gregg v. Georgia,* 428 U.S. 153, 163 n. 6, 96 S.Ct. 2909, 2920 n. 6, 49 L.Ed.2d 859 (1976),[2] the 1972 Georgia legislation required that the trier of fact find the existence of certain specified aggravating circumstances before the death penalty could be imposed. *See id.* at 165–66, 96 S.Ct. at 2921–22. The Georgia statute also permitted the jury to consider "nonstatutory aggravating or mitigating circumstances," although the nature or scope of the nonstatutory aggravating or mitigating circumstances was not set forth in the statute. *Id.* at 164, 96 S.Ct. at 2921. Moreover, the Georgia statute provided that if the sentence imposed was death, the judge or jury must specify the aggravating circumstance(s) found to justify the penalty. *Id.* at 166, 96 S.Ct. at 2922.

The Supreme Court reviewed the constitutionality of the penalty phase procedures of

---

true, none of the cases cited by the majority support the contention that a defendant may challenge a statute by recasting a proportionality argument, which he lacks standing to present, in the form of a claim that the statute fails to comply with the mandate of *Furman.*

2. At the time *Gregg* was decided, Georgia provided for the alternative punishment of death for six crimes: murder, kidnapping for ransom or where the victim was harmed, armed robbery, rape, treason, and aircraft hijacking. *See Gregg,* 428 U.S. at 162–63, 96 S.Ct. at 2920.

this new legislation in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). The Court first confronted the question that was left unresolved in *Furman*, namely, whether "the punishment of death for the crime of murder is, under all circumstances, 'cruel and unusual' in violation of the Eighth and Fourteenth Amendments of the Constitution." *Id.* at 168, 96 S.Ct. at 2922. The Court determined that it was not. *Id.* at 187, 96 S.Ct. at 2931–32.

The Court next considered whether the 1972 Georgia statute had overcome the constitutional deficiencies of the procedures followed in the *Furman* prosecution. *Furman*, the Court noted, prohibited the imposition of the death penalty where the "sentencing procedures ... created a substantial risk that it would be inflicted in an arbitrary and capricious manner." *Id.* at 188, 96 S.Ct. at 2932. The Court further explained that "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189, 96 S.Ct. at 2932.

The Court ruled that the sentencing procedures devised by the State of Georgia met the requirements prescribed in *Furman*, reasoning that:

> [t]he basic concern of *Furman* centered on those defendants who were being condemned to death capriciously and arbitrarily. Under the procedures before the Court in that case, sentencing authorities were not directed to give attention to the nature or circumstances of the crime committed or to the character or record of the defendant. Left unguided, juries imposed the death sentence in a way that could only be called freakish. The new Georgia sentencing procedures, by contrast, focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant. While the jury is permitted to consider any aggravating or mitigating circumstances, it must find and identify at least one statutory aggravating factor before it may impose a penalty of death. In this way the jury's

discretion is channeled. No longer can a jury wantonly and freakishly impose the death sentence; it is always circumscribed by the legislative guidelines.

*Id.* at 206–07, 96 S.Ct. at 2940–41.

### C. *Texas' Response to Branch v. Texas*

In *Branch v. Texas*, which was consolidated with *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Court held unconstitutional Texas' system for imposing capital punishment. *Id.* at 239–40, 92 S.Ct. at 2727. In response, the Texas Legislature revised its death penalty statute. With regard to murder, Texas redefined capital homicide, limiting the punishment of death to:

> [1] murder of a peace officer or fireman; [2] murder committed in the course of kidnaping, burglary, robbery, forcible rape, or arson; [3] murder committed for remuneration; [4] murder committed while escaping or attempting to escape from a penal institution; and [5] murder committed by a prison inmate when the victim is a prison employee.

*See Jurek v. Texas*, 428 U.S. 262, 268, 96 S.Ct. 2950, 2954–55, 49 L.Ed.2d 929 (1976).

Texas also adopted a new procedure to be followed in cases wherein the jury found the defendant guilty of a capital homicide. *Id.* at 269, 96 S.Ct. at 2955. This procedure required the jury to answer the following questions:

> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
>
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
>
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

*Id.* (quoting Tex.Code Crim.Proc., Art. 37.-071(b) (Supp.1975–76)). If a Texas jury found that the prosecution had proved beyond a reasonable doubt that the answer to

each question was yes, the death penalty was imposed. *Id.* If the answer to any question was no, a sentence of life imprisonment was imposed. *Id.*

In *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), the petitioner was convicted of killing a woman during the perpetration of a kidnapping and rape. *Id.* at 264–67, 96 S.Ct. at 2953–54. After considering evidence of mitigating and aggravating circumstances submitted during the punishment phase of the bifurcated proceedings, the jury answered yes to the following applicable questions:

(1) whether the evidence established beyond a reasonable doubt that the murder of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result, and (2) whether the evidence established beyond a reasonable doubt that there was a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

*Id.* at 267–268, 96 S.Ct. at 2954. In accordance with the jury's unanimous affirmative vote, the state trial court sentenced the petitioner to death. *Id.* at 268, 96 S.Ct. at 2954–55.

On certiorari to the United States Supreme Court, the petitioner argued that the Texas statute violated the Eighth and Fourteenth Amendments because it did not eliminate the arbitrary and capricious nature of the system found unconstitutional in *Branch* and *Furman.* *Id.* at 274, 96 S.Ct. at 2957. The Court rejected this argument, concluding that

[w]hile Texas has not adopted a list of statutory aggravating circumstances the existence of which can justify the imposition of the death penalty as have Georgia and Florida, its action in narrowing the categories of murders for which a death sentence may ever be imposed serves much the same purpose.

*Id.* at 270, 96 S.Ct. at 2955. The Court noted that "the principle difference between Texas and [Georgia and Florida] is that the death penalty is an available sentencing option— even potentially—for a smaller class of mur-

ders.... Otherwise the statutes are similar. Each requires the sentencing authority to focus on the particularized nature of the crime." *Id.* at 271, 96 S.Ct. at 2956. Thus, *in defining the crime,* the Texas statute adequately narrowed the class of murderers subject to the death penalty.

The Court also concluded that to meet the constitutional requirement of individualized sentencing,

[a] jury must be allowed to consider on the basis of all the relevant evidence not only why a death sentence should be imposed, but also why it should not be imposed.

Thus, in order to meet the requirement of the Eighth and Fourteenth Amendments, a capital-sentencing system must allow the sentencing authority to consider mitigating circumstances.

*Id.* Unlike the Georgia statute that directed the jury to consider mitigating factors, Texas law "[did] not explicitly speak of mitigating circumstances." *Id.* at 272, 96 S.Ct. at 2956. Nevertheless, the Court upheld the constitutionality of the Texas statute because the Texas Court of Criminal Appeals had interpreted the second statutory question "so as to allow a defendant to bring to the jury's attention whatever mitigating circumstances he may be able to show." *Id.*

The Court summarized its holding in *Jurek* in the following passage:

Texas law essentially requires that one of five aggravating circumstances be found before a defendant can be found guilty of capital murder, and that in considering whether to impose a death sentence the jury may be asked to consider whatever evidence of mitigating circumstances the defense can bring before it. It thus appears that, as in Georgia and Florida, the Texas capital-sentencing procedure guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender before it can impose a sentence of death.

*Id.* at 273–274, 96 S.Ct. at 2957.

The Court concluded that "[b]ecause [the Texas] system serves to assure that sen-

tences of death will not be 'wantonly' or 'freakishly' imposed, it does not violate the Constitution." *Id.* at 276, 96 S.Ct. at 2958.

### D. *Application of the Narrowing Principle to Louisiana Law*

In *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the Supreme Court reviewed Louisiana's death penalty scheme. Louisiana law divided homicide into five grades: first-degree murder, second-degree murder, manslaughter, negligent homicide, and vehicular homicide. *Id.* at 241, 108 S.Ct. at 553. Second-degree murder included intentional murder and felony murder. The punishment for second-degree murder was life imprisonment without the possibility of parole. *Id.* First degree murder was limited to a narrower class of homicides—the killing of a human being:

(1) When the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, aggravated escape, aggravated arson, aggravated rape, aggravated burglary, armed robbery, or simple robbery;

(2) When the offender has a specific intent to kill or to inflict great bodily harm upon a fireman or peace officer engaged in the performance of his lawful duties;

(3) When the offender has a specific intent to kill or to inflict great bodily harm upon more than one person; or

(4) When the offender has specific intent to kill or inflict great bodily harm and has offered, has been offered, has given, or has received anything of value for the killing.

(5) When the offender has the specific intent to kill or to inflict great bodily harm upon a victim under the age of twelve years.

*Id.* at 241–42, 108 S.Ct. at 553 (quoting La. Rev.Stat.Ann. § 14:30A (West 1986)).

Under this statutory scheme, after a jury found an individual guilty of first-degree murder during the guilt phase of the trial, the jury selected the punishment in a separate proceeding. *Id.* at 242, 108 S.Ct. at 553. Louisiana law provided that " '[a] sentence of death [could] not be imposed unless the jury [found] beyond a reasonable doubt that at least one statutory aggravating circumstance exist[ed] and, after consideration of any mitigating circumstances, recommend[ed] that the sentence of death be imposed.' " *Id.* (quoting La.Code Crim.Proc.Ann., Art. 905.3 (West 1984)). If the jury was not persuaded that at least one of the ten aggravating circumstances identified by statute had been proved, it could only impose a sentence of imprisonment without benefit of parole, probation, or suspension of sentence. *Id.*

The petitioner in *Lowenfield* was found guilty of three counts of first-degree murder under section 14.30A(3), an essential element of which was a finding that he intended " 'to kill or to inflict great bodily harm upon more than one person.' " *Id.* at 233, 108 S.Ct. at 549 (quoting La.Rev.Stat.Ann. § 14.30A(3) (West 1986)). During the penalty phase of the trial, the jury found that the evidence demonstrated the existence of one of the aggravating circumstances listed by statute—the offender knowingly created " 'a risk of death or great bodily harm to more than one person.' " *Id.* at 235, 108 S.Ct. at 549 (quoting La.Code Crim.Proc.Ann., Art. 905.-4(d) (West 1984)). Under Louisiana law, section 14.30A(3) and article 905.4(d) were "interpreted in a 'parallel fashion.' " *Id.* at 243–44, 108 S.Ct. at 554 (citing *State v. Williams,* 480 So.2d 721, 726–27 (La.1985)). The petitioner was sentenced to death. *Id.* at 235, 108 S.Ct. at 549.

Before the Supreme Court, the petitioner argued that the death sentence imposed by the trial court violated the Eighth Amendment because the aggravating circumstance found by the jury "merely duplicate[d] an element of the underlying offense of first-degree murder of which he was convicted at the guilt stage." *Id.* at 233, 108 S.Ct. at 548. In rejecting this contention, the Court summarized its prior analysis of the narrowing requirement of the Eighth Amendment in capital cases as follows:

It seems clear to us ... that the narrowing function required for a regime of capital punishment may be provided in either of these two ways: The legislature may itself narrow the definition of capital of-

fenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern, or the legislature may more broadly define capital offenses and provide for narrowing by jury findings of aggravating circumstances at the penalty phase.

*Id.* at 246, 108 S.Ct. at 555. The Court concluded that Louisiana's death penalty scheme was constitutional because the statutes narrowed the class of persons eligible for the death penalty and thereby limited the jury's discretion. *Id.*

In so doing, the Court made it clear that its decisions have not diluted the principle first announced by the plurality opinion in *Furman* that state laws which allow juries to recommend the penalty of death arbitrarily and capriciously violate the Eighth and Fourteenth Amendments. Since *Furman* was decided, the Court has upheld state laws that restrict or guide the exercise of discretion in capital murder cases. In *Gregg*, the Court instructed that a state may, without violating the Constitution, continue to define the crime of murder as it was at common law if its laws also require the jury to find expressly the existence of an aggravating circumstance that narrows the class of persons eligible for the death penalty. In *Jurek*, the Court ruled that a state may eliminate the possibility that a jury will act capriciously or arbitrarily by "narrowing the categories of murders for which a death sentence may ever be imposed," without requiring that the jury also find the existence of an aggravating circumstance. *Jurek*, 428 U.S. at 270, 96 S.Ct. at 2955. The Court further confirmed the constitutional validity of this approach in *Lowenfield*. Thus, a death penalty statute which limits the discretion of the trier of fact, either during the guilt phase by narrowly defining the class of capital crimes, or during the penalty phase by specifying aggravating circumstances, may be upheld.

The Court cautioned in *Gregg* that "each distinct [capital sentencing] system [of restraining jury discretion] must be examined on an individual basis." *Gregg*, 428 U.S. at 195, 96 S.Ct. at 2935. An examination of the federal statutes challenged in this matter, as applied to Cheely, reveals that the imposition of capital punishment is restricted to a particularly heinous form of homicide.

## V. The Crime of Sending an Explosive Device to Kill or Injure Property Which Results in Death is Narrowly Defined

Critical to the resolution of the issues presented in this appeal is that we are *not* reviewing a federal statute which purports to punish all forms of homicide regardless of the intent of the perpetrator and without any guidelines to limit the jury's discretion. Such a statute would unquestionably violate the plurality opinion in *Furman*. Furthermore, Congress has not in these statutes purported to punish common law murder committed within a state's territorial jurisdiction. The exercise of the police power is not included in the enumerated powers of Congress set forth in Article I, Section 8 of the Constitution. The Tenth Amendment makes this restriction quite clear by providing that "[t]he powers that are not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States, respectively, or to the people." U.S. Const. amend. X. Unlike the States, which possess the power to enact broad homicide statutes which specify aggravating circumstances to narrow the class of murderers subject to the death penalty, Congress, in lawfully exercising its authority to regulate the mail and commerce, is limited to the enactment of statutes which narrowly define capital crimes. As discussed above, we must presume it did so in adopting sections 844(d) and 1716(a), mindful of its duty to comply with the Eighth Amendment. *Gregg v. Georgia*, 428 U.S. at 175, 96 S.Ct. at 2926.

Cheely argues that sections 844(d) and 1716(a) are unconstitutional because they were enacted before the publication of *Furman v. Georgia* in 1972. Appellee's Brief at 3, 11. The district court appears to have been persuaded by this argument. In justifying its ruling, the trial judge commented as follows:

In analyzing the three statutes in question in this case, it is important to bear in mind that all of them were enacted pre–*Furman*, so that in enacting the statutes, no Congress person sat down and sought to

find language to meet the concerns articulated by the Supreme Court in *Furman.* The most that could be said is that in subsequent decisions of the U.S. Supreme Court, and particularly the *Lowenfield* decision, sufficiently backtracked on *Furman* to make a *Furman* response unnecessary. The Court is not prepared to find that.

Transcript of Proceedings, May 28, 1992, at 48–49. The majority apparently shares the view that all pre–*Furman* federal statutes are per se unconstitutional. *See* Majority opinion at 1444 n. 12. The only authority cited by the majority for this novel proposition is the dissenting opinion of Chief Justice Burger in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Chief Justice Burger speculated that the plurality opinion in *Furman* would require state legislatures and Congress "to make a thorough re-evaluation of the entire subject of capital punishment." *Id.* at 403, 92 S.Ct. at 2811 (Burger, C.J., dissenting).

Chief Justice Burger's obiter dictum assumed that the Court's three-judge plurality opinion effectively declared that all state and federal statutes *not* reviewed by the Court in *Furman* violated the Eighth Amendment. Unfortunately, Chief Justice Burger did not cite any authority to support his suggestion that the plurality opinion in *Furman* invalidated all existing state and federal death penalty legislation. Furthermore, I am unaware of any authority that holds that a dissenting judge's dire prediction of the woeful consequences that will flow from the majority's constitutional interpretation has any precedential value.

In fairness, it should be noted that Chief Justice Burger could not have anticipated the subsequent evolution of death penalty jurisprudence. He could not have anticipated that three years later, in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court would hold that death penalty statutes are presumed to be valid, or that an accused faces a heavy burden in challenging their constitutionality. Chief Justice Burger also had no way of knowing in 1972 that the Supreme Court would hold in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and *Lowenfield v.*

*Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), that a statute may comply with the Eighth Amendment by narrowly defining a capital crime, although not requiring the jury to find an aggravating circumstance. Furthermore, the notion that the Court's decision in *Furman* also invalidated every existing state and federal statute whose validity was not being challenged in the matter before the Court, is contrary to the Court's later admonition in *Gregg* that "each distinct [capital sentencing] system [of restraining jury discretion] *must be examined on an individual basis." Gregg,* 428 U.S. at 195, 96 S.Ct. at 2935 (emphasis added).

Having individually examined sections 844(d) and 1716(a), I would hold that they comply with the narrowing standard set forth in *Jurek* and *Lowenfield.* In *Lowenfield,* the Supreme Court explained that the constitutional requirements set forth in *Furman* are satisfied by a system which limits the discretion of the trier of fact either during the guilt phase by narrowly defining the class of capital crimes, or during the penalty phase by specifying aggravating circumstances. *Lowenfield,* 484 U.S. at 246, 108 S.Ct. at 555. The Court has ruled that by making the death penalty a sentencing option for a smaller class of murderers, a statute may sufficiently channel the jury's discretion at the guilt phase. *Jurek,* 428 U.S. at 270–71, 96 S.Ct. at 2955–56. In enacting sections 844(d) and 1716(a), Congress has confined the imposition of capital punishment to a person who has sent an explosive device through the mails with the intent to injure or kill the recipient and has succeeded in his plan. In so doing, Congress narrowly defined the type of offenders who may be subject to the death penalty—those who intentionally kill by use of a mail bomb. No further narrowing is required.

Through sections 844(d) and 1716(a), Congress targeted a particularly depraved type of killer—the cowardly assassin who intentionally and furtively kills from afar by means of a lethal device, disarmingly concealed in a wrapped container. Contrary to the majority's suggestion, there is no possibility that the jury to be selected someday to

try this case will be permitted to render a wanton and freakish recommendation that would result in the death penalty for a person "guilty of no more than involuntary manslaughter." Majority opinion at 1444. Because these statutes do not permit the trier of fact to act arbitrarily and capriciously, Cheely has failed to meet his heavy burden of demonstrating a violation of the Eighth Amendment.

## VI. The Majority's Reliance on *United States v. Harper* is Misplaced

The majority finds support for its determination that the mail bomb statutes are unconstitutional in this court's decision in *United States v. Harper*, 729 F.2d 1216 (9th Cir. 1984). This reliance is misplaced. In *Harper*, the appellant was charged with espionage, in violation of subsections (a) and (c) of 18 U.S.C. § 794. *Id.* at 1218 n. 1. Pursuant to section 794(a), any person who is convicted of transmitting to a foreign nation anything relating to the national defense, "with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation," is subject to punishment by death or life imprisonment. *Id.*

The analysis employed in *Harper* to declare this statute unconstitutional does not support the majority's decision in this case. If anything, the *Harper* rationale requires this court to uphold the constitutionality of

the penalty provisions of sections 844(d) and 1716(a). In section 794(a), Congress lumped together in one statute all forms of espionage. Congress did not distinguish the types of espionage that in its judgment required the death penalty from other forms less threatening to our national defense or public safety. For example, Congress did not focus on spies whose betrayal directly caused the death of another person. Unlike the mail bomb statutes, section 794(a) did not require any demonstration that anyone was injured. A mere showing that the espionage communication assisted another nation was sufficient to trigger the imposition of the death penalty.[3]

Unlike section 794(a), the mail bomb statutes involved in this case narrowly define the type of conduct that must be proved before the jury can find the accused guilty and thereby subject to the death penalty. Thus, Congress, in its definition of the crime, has confined the jury's ability to recommend the death penalty to a case wherein the defendant mailed a bomb with the intent to injure or kill the recipient, and caused the death of a human being. This method of narrowing the jury's discretion in death penalty cases is consistent with the statutes upheld in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), and *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). Because sections 844(d) and 1716(a) do not violate the Eighth Amendment, congressional amendment of these

---

3. It should be noted that section 794(a) authorized the imposition of the death penalty in the absence of proof that any person was injured or killed as the result of the accused's alleged espionage activities. In *Coker v. Georgia*, 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), decided seven years *before Harper*, the Supreme Court held that "death is . . . a disproportionate penalty for the crime of raping an adult woman." *Id.* at 597, 97 S.Ct. at 2869. In *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), the Supreme Court held that the Eighth Amendment does not permit the imposition of the death penalty on one who "aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." *Id.* at 797, 102 S.Ct. at 3376. These Supreme Court decisions suggest that the death penalty may not be imposed absent a homicide.

The appellant in *Harper* was not accused of taking a human life in the perpetration of the crime of espionage. Section 794(a) did not require proof that another person was killed before the death penalty could be imposed. The panel that decided *Harper* failed to consider or apply the principle set forth in *Coker* and *Enmund* that the death penalty is an excessive punishment for someone who has not taken human life. Perhaps this court's failure in *Harper* to apply dispositive decisions of our nation's highest court was caused, at least in part, because counsel for both parties believed that section 794(a) was unconstitutional *solely* because the statute failed to provide statutory guidelines to control the trier of fact's discretion. *Harper*, 729 F.2d at 1218, 1225–26. Had the panel in *Harper* applied *Coker* and *Enmund*, it would have been unnecessary for it to reach out to decide whether section 794(a) was unconstitutional because Congress did not provide guidelines to limit the jury's discretion.

statutes after the Supreme Court announced its decision in *Furman* was unnecessary. I would hold that Cheely has failed to bear his heavy burden of overcoming the presumption of constitutionality of a punishment prescribed by the duly elected members of Congress.

## VII. The Statutes Need Not Explicitly Provide for the Consideration of Mitigating Evidence

Cheely also argues that the mail bomb statutes violate the Eighth Amendment because they do not expressly require that the jury consider mitigating evidence in choosing between life imprisonment and the death penalty. This contention lacks merit.

Rule 402 of the Federal Rules of Evidence provides that all relevant evidence is admissible. Fed.R.Evid. 402. Under the Eighth Amendment, evidence that might cause a jury to decline to impose the death penalty must be admitted. *McCleskey v. Kemp*, 481 U.S. 279, 304, 107 S.Ct. 1756, 1773–74, 95 L.Ed.2d 262 (1987). Therefore, the Constitution dictates that any evidence which might reasonably be deemed to have mitigating value is relevant and admissible, *McKoy v. North Carolina*, 494 U.S. 433, 440, 110 S.Ct. 1227, 1232, 108 L.Ed.2d 369 (1990), and the exclusion of such evidence would violate the Eighth Amendment. *Lockett v. Ohio*, 438 U.S. 586, 608, 98 S.Ct. 2954, 2966–67, 57 L.Ed.2d 973 (1978). Contrary to Cheely's contention, Congress, in adopting Rule 402 of the Federal Rules of Evidence, has provided for the admission of mitigating circumstances in federal death penalty cases.

Cheely further contends that the mail bomb statutes are unconstitutional because Congress failed to spell out the procedure that must be followed during the sentencing phase. We rejected a similar argument in *McKenzie v. Risley*, 842 F.2d 1525, 1542 n. 35 (9th Cir.) (en banc), *cert. denied*, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988). We disposed of this issue with the following words:

> *Harper* correctly notes that the Supreme Court has expressly required *statutory* aggravating circumstances in a death sentencing scheme. McKenzie apparently reads *Harper* as requiring similar explicit statutory provisions for consideration of mitigating circumstances, *including detailed procedures for implementing this review*. Such a reading of *Harper* would, of course, conflict with *Jurek*. We therefore decline to so interpret *Harper*.

*Id.* (emphasis added).

The trial in this matter has been delayed pending resolution of this appeal. We therefore have the opportunity to direct the trial court to conduct sentencing proceedings if the jury returns a guilty verdict, to admit all mitigating evidence pursuant to Rule 402, and to instruct the jury according to the Eighth Amendment jurisprudence of the Supreme Court. Since the mail bomb statutes already narrow the class eligible for the death penalty in the definition of the crime, they are constitutional "even though [they] clearly did not channel the jury's discretion by enunciating specific standards to guide the jury's consideration of aggravating and mitigating circumstances." *Zant v. Stephens*, 462 U.S. 862, 875, 103 S.Ct. 2733, 2742, 77 L.Ed.2d 235 (1983).

## Conclusion

In sections 844(d) and 1716(a), Congress has focused on a vicious type of killer whose conduct endangers all persons who come into contact with his lethal package, whether or not they are the target of his depraved intent. The statutes comply fully with the Supreme Court's decisions that statutes may narrowly define capital crimes as a means of preventing juries from arbitrarily and capriciously recommending the death penalty.

The fact that the mail bomb statutes do not specify statutory mitigating circumstances does not conflict with the Eighth Amendment. The rules of evidence presently allow for the admission of mitigating evidence. Any error in the exclusion of mitigating evidence that may occur at trial may be appealed as a matter right to this court. This court can also direct the district court to the body of law that has evolved since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), regarding the manner of conducting sentencing proceedings and the

instructions that should be provided to the jury.

Cheely has failed to meet the heavy burden of overcoming the presumption of constitutionality of an act of Congress. I would reverse the district court's determination that the mail bomb statutes violate the Eighth Amendment.

I concur in the majority's judgment that the district court properly granted the motion to suppress.